**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**ATHENS DIVISION**

| | |
|---|---|
| **THE UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**STEVEN EHIZOJIE OBOITE,**<br><br>***Defendant*.** | **Case No. 3:25-cr-11-001-TES** |

# ORDER DENYING DEFENDANT'S (10) MOTIONS TO SUPPRESS[1]

On May 14, 2025, a grand jury returned a one-count indictment against Defendant Steven Ehizojie Oboite ("Defendant") and six co-defendants charging them with Conspiracy to Distribute Fentanyl and Methamphetamine in violation of 21 U.S.C. § 846, in connection with 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(vi), and 841(b)(1)(A)(viii).[2] [Doc. 1, p. 9]. Spread across ten motions to suppress, Defendant asks the Court to throw out the government's collected evidence that it intends to use against him to secure a

[1] The Court wishes to thank Bianca Medeiros Pinto, who interned with the Court after finishing her first year at University of Chicago Law School, for her extraordinary work on this order. Ms. Medeiros spent countless hours on this case this summer, combing through a dense and difficult record and performing extensive research on a wide swath of thorny Fourth Amendment issues. Having completed a successful first year at such a prestigious law school, the Court knew she would deliver a top-notch product and she did not disappoint. The Court could not have been more pleased with her work, her work ethic and her exceptional performance. And, she is an absolute delight to have in chambers. The excellent portions of this order can be attributed solely to her; any mistakes or areas that fall short belong to me. Keep your eye on her, she is going places. There just aren't many like her.

[2] These co-defendants do not join in the motions to suppress before the Court.

conviction, effectively ending the case. In his host of motions, Defendant points to all manner of supposed Fourth Amendment violations. For the reasons explained more fully below, the Court **DENIES** each motion.

The evidence in question comes from nine warrants and two intersecting investigations spanning five years. With a full understanding of Defendant's positions before the Court, you'll see that many of the issues across his ten motions overlap. So, rather than address each motion individually, the Court takes an issue-by-issue approach in ruling on Defendant's suppression efforts. At the outset, his motions challenge the conduct of three separate law enforcement agencies: the Atlanta Police Department (the "APD"), the Georgia Department of Natural Resources (the "DNR"), and the Federal Bureau of Investigation (the "FBI"). Due to the complexity of the facts surrounding Defendant's motions, the Court divides its rulings into two parts.

First, it begins with Defendant's motions challenging six warrants that the APD initially obtained in 2022. These motions launch challenges to the search of phone records from AT&T, iCloud records, Google search records, the seizure warrant for Defendant's iPhone SE, the seizure warrant for Defendant's iPhone 13 ProMax, and the search warrant for both of those phones. [Doc. 161]; [Doc. 162]; [Doc. 163]; [Doc. 164]; [Doc. 165]; [Doc. 169]. As explained below, the Court finds that the APD's warrants and searches comply with the Fourth Amendment so that they do not require suppression. Relying on that conclusion, the Court then turns to the motions to suppress targeting

the FBI's investigation of Defendant.

It's important to note, however, that the FBI's investigation into Defendant both preceded and extended beyond the APD's investigation. For this reason, the second part of the Court's discussion encompasses an additional subset of facts. As to that second part, the relevant motions pertain to conduct from the FBI and a third law-enforcement entity, the DNR. These remaining motions challenge the FBI and DNR's warrantless seizure of a third phone—Defendant's "DNR Phone." [Doc. 167]. In addition to mounting challenges against the FBI and DNR's seizure of the DNR Phone, Defendant also asserts suppression efforts related to three sealed federal warrants for his Apple records, Google search records, and DNR Phone. [Doc. 168]; [Doc. 170]; [Doc. 176].

## PROCEDURAL BACKGROUND

The Court held an evidentiary hearing on Defendant's motions to suppress on April 15, 2026, completing it on May 18, 2026. [Doc. 221]; [Doc. 234]. At the April 15th hearing, the government called one witness, Corporal Tyler Lewis with the DNR. Defendant did not call any witnesses. At the May 18th hearing, the government called three additional witnesses: Detectives Kevin Leonpacher and Scott Demeester with the APD and Special Agent Brian McCusker with the FBI. Defendant called one witness, Officer Charles Ross with the APD. In addition to receiving testimony from the witnesses, the Court admitted 33 exhibits and reviewed all of them.

Unfortunately, neither the hearing nor the parties' briefs provided the Court with a cohesive and complete factual background. For the ins and outs of the suppression arguments to have any hope of comprehension for its readers, the Court must take the time to provide the relative facts. In doing so, based on the evidence presented through testimony and through filings on the record, the Court exercises its considerable discretion and finds that the government has established the following facts by a preponderance of the evidence. *United States v. Beechum*, 582 F.2d 898, 913 n.16 (5th Cir. 1978) (citing *Lego v. Twomey*, 404 U.S. 477, 489 (1972)).[3]

**FACTUAL BACKGROUND – APD WARRANTS**

On August 1, 2022, Allahnia Lenoir was reported missing by her mother, Jannette Jackson, and her friend, Tori Green. [Doc. 236-18]. For nearly two hours, Ms. Green sat for an interview with the APD to provide her account of Ms. Lenoir's activities just before her disappearance. *See generally* [Doc. 204, Green Interview Video].[4]

Ms. Green and Ms. Lenoir were hanging out on July 30, 2022, when Ms. Lenoir suggested they go to a friend's home. [*Id.* at 22:00]. Ms. Lenoir and Ms. Green left the strip club where they worked at around 9:30 PM. About 30 to 45 minutes later, the pair

---

[3] The decisions handed down prior to the close of business on September 30, 1981, by the United States Court of Appeals for the Fifth Circuit (the 'former Fifth' or the 'old Fifth') "shall be binding as precedent in the Eleventh Circuit" for the court of appeals, the district courts, and the bankruptcy courts. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981).

[4] The facts describing Ms. Green's interview with the APD come directly from the Court's observation of a video submitted by the government on April 15, 2026. [Doc. 204, Green Interview Video].

arrived at Ms. Lenoir's friend's apartment at 1660 Peachtree Street NE in Atlanta, Georgia, so that Ms. Lenoir could "make plays."[5] [*Id.* at 22:20–58]. Specifically, Ms. Lenoir told Ms. Green that Defendant was her "Percocet play," which Ms. Green defined as a sexual act where Defendant would watch Ms. Lenoir consume a Percocet. [*Id.* at 29:45]. Two men were present at the apartment: Devin Reynolds (the tenant) and Defendant. [*Id.* at 24:35]. Prior to this night, Ms. Green had never met Mr. Reynolds or Defendant. [*Id.* at 22:00, 27:20]. Once inside, Ms. Lenoir, Ms. Green, Mr. Reynolds, and Defendant hung out in the kitchen area for most of the night where they drank alcohol and consumed various substances, including psylocibin mushrooms and cocaine. [*Id.* at 27:30–55, 28:35–31:50]. At some point, Defendant took mushrooms, retreated to one of the bedrooms in the apartment and "knocked out," while Ms. Green went to a different bedroom with Mr. Reynolds and engaged in sexual acts. [*Id.* at 36:00–25]. Ms. Green received $400.00 in exchange for having sexual intercourse with Mr. Reynolds. [*Id.* at 35:00]. Once finished, Ms. Green went and sat in the living room while Ms. Lenoir joined Mr. Reynolds to also engage in sexual acts. [*Id.* at 32:30–33:10]. When Ms. Lenoir and Mr. Reynolds rejoined Ms. Green in the living room, the three began talking, which caused Defendant to wake up, so he rejoined them. [*Id.* at 33:00, 39:00]. Around 11:00 P.M., Defendant and Ms. Lenoir went to the same bedroom he'd just slept in to engage

[5] Ms. Green explained to the APD that to "make plays" means to exchange some sort of sexual contact for money. [Doc. 204, Green Interview Video at 23:30].

in sexual acts. [*Id*. at 36:45, 39:20–40].

As midnight rolled around, Ms. Green decided she wanted to go home because she was too intoxicated, but Ms. Lenoir wanted to stay. [*Id.* at 24:00]. Although Ms. Lenoir had been highly intoxicated earlier in the night, Ms. Green thought she seemed coherent and "fine" to stay behind on her own. [*Id*. at 41:30–42:00]. The four decided that when Ms. Lenoir was ready to go home, either Mr. Reynolds or Defendant would call an Uber for her because she needed to watch her brother in Douglasville the next morning.[6] [*Id*. at 44:15–40, 52:50–53:05]. Ms. Green saved Defendant's phone number and asked that he text her once Ms. Lenoir was home. [*Id*. at 44:00, 58:00]. At 12:30 A.M., Ms. Green left the apartment with her boyfriend who had arrived to pick her up. [*Id*. at 42:50].

The next morning, Ms. Green realized she had not heard from Ms. Lenoir confirming that she got home. [*Id*. at 44:40–45:10]. She initially did not think much of this because it was not out of character for Ms. Lenoir to come home after a night of partying and sleep in until late into the afternoon. [*Id*.]. However, she began to grow concerned when she still had not heard from Ms. Lenoir by five o'clock the following evening. [*Id*. at 45:10]. Likewise, neither Ms. Lenoir's mother nor her boyfriend had heard from her, which was unusual because Ms. Lenoir spoke daily to all three. [*Id*. at

[6] Ms. Green stated in her testimony to the APD that it was very common for someone to have to arrange ride shares for Ms. Lenoir because she did not have the Uber app, nor did she have a debit card to use. [Doc. 204, Green Video Interview at 44:30]

44:40, 55:00]. Ms. Green reached out to Mr. Reynolds and Defendant to ask about Ms. Lenoir's whereabouts, but neither was particularly helpful. [*Id*. at 45:30]. Each time they spoke to Ms. Green, they provided a different story, sometimes stating that Ms. Lenoir had left in the morning and, at other times, stating that she had left earlier in the night. [*Id*. at 45:30, 01:08:20–01:09:36, 01:12:20–01:13:00]. They also told Ms. Green that Ms. Lenoir never asked them to call her an Uber and, at some point, said that Ms. Lenoir was very "inebriated" when she left. [*Id*. at 45:30–46:00, 01:11:10–01:11:55]. Ms. Green was adamant in her statements to the APD that Ms. Lenoir seemed fine before she left—leading Ms. Green to believe the three consumed more drugs following her departure. [*Id*. at 42:00, 44:00]. Mr. Reynolds and Defendant, however, both denied taking any more drugs. [*Id*. at 42:00, 01:11:55–01:12:10]. Defendant specifically said he did not recall taking any more drugs but that he didn't know because he was "pretty lit." [*Id*. at 01:12:10]

Unsatisfied and growing more concerned, Ms. Green continued her zealous self-directed investigation, even sitting outside the apartment to hopefully speak with Mr. Reynolds or Defendant. [*Id*. at 43:00, 01:07:00, 01:10:00]. At one point, Ms. Green became fed up with the lack of clarity in their responses and how their stories simply didn't make sense, and she told Defendant that if he did not provide better answers then she would send the police because both he and Mr. Reynolds were telling her things that did not add up. [*Id*. at 01:13:20]. To this, Defendant responded, "What the hell are you

implying? Your girl was fucked, sobered up, and left. I'll call her, but you def owe me an apology. Asshole." [*Id*]. Ms. Green ultimately contacted the APD, at which point she informed them that Ms. Lenoir was missing, that she was concerned because she had last seen her with Mr. Reynolds and Defendant under the influence of numerous substances, and that it was unlike Ms. Lenoir to be unresponsive for this long. *See generally* [Doc. 204, Green Interview Video].

Detective Demeester, the lead investigator on the case, began his investigation by reviewing Ms. Lenoir's cell phone records, obtained from T-Mobile. [Doc. 236-18, p. 4]. The records were able to corroborate much of what Ms. Green reported, showing that Ms. Lenoir called Defendant earlier in the night and that her cell phone pinged a cell tower close to the apartment and continued to use the same cell tower until her last documented activity at 3:27 AM the next day. [*Id.*]. A subsequent review of the apartment's parking garage surveillance showed Defendant's vehicle, a four-door Jeep Wrangler identified by Ms. Green in the interview, entering and exiting the parking garage several times throughout the night of July 30 and early morning hours of July 31. [*Id.*]; [Doc. 204, Green Interview Video, 01:03:00].

A few days later, Detective Demeester called Ms. Green to follow up on her interview with some additional questions. *See generally* [Doc. 204, Green Phone Audio]. Ms. Green again confirmed that Defendant and Mr. Reynolds took mushrooms while she and Ms. Lenoir were at the apartment. [*Id*. at 02:35]. She further advised of a new

anomaly she'd discovered during her own investigation. Ms. Green said she was able to contact an "old lady" with "balls of steel" who lived in the apartment complex. [*Id.* at 09:54]. This resident banged on Mr. Reynold's apartment door until he eventually let her in. [*Id.*]. With the resident on a FaceTime call with Ms. Green, she walked around the entire apartment to show her what it looked like. [*Id*]. Ms. Green noted to Det. Demeester that the apartment was suspiciously spotless and looked like someone had scrubbed it down. [*Id.*]. According to Ms. Green, the apartment was drastically different from the filthy one she'd visited just days before. [*Id.*]. Ms. Green asked Det. Demeester if he could provide her with any updates, at which point he candidly informed her that they had nothing. [*Id.* at 03:20]. Ms. Green asked why they couldn't just arrest Defendant and Mr. Reynolds to which Det. Demeester responded, "[w]e can't do that…we gotta have reason to believe that…a person has been or is about to be committing a crime for us to put handcuffs on them." [*Id.* at 09:05]. He then informed Ms. Green that he would try to get a search warrant, but that he needed to try and figure out a crime because he didn't know what, if anything, happened to Ms. Lenoir, but that if they gave her drugs then that was technically a crime. [*Id.* at 14:23].

Based on Defendant's possession of a controlled substance, Det. Demeester obtained a warrant for Defendant's phone records from AT&T. [Doc. 236–18]. A review of those records showed that Defendant left the apartment around 04:48 A.M., calling several pharmacies just before his departure. [Doc. 236-20, p. 2]. After leaving the

apartment, Defendant continued to call numerous other pharmacies, fire rescue non-emergency numbers, various urgent cares, Emory Hospital, Narcan distribution centers, and drug rehabilitation facilities, all while driving around the Northeast Atlanta, Dekalb County area until around 8:07 A.M. when he received a call from Mr. Reynolds. [*Id.*]. At this point, Defendant returned to the apartment. [*Id.*].

Defendant arrived back at the apartment around 8:21 A.M., only to be seen on the parking garage surveillance cameras departing again less than an hour later. [*Id.*]. He then traveled to Douglas County from 9:44 A.M. through 10:27 A.M. [*Id.*]. Ms. Lenoir's phone records also showed that her cell phone traveled to Douglas County with Defendant before disconnecting from the network and not reconnecting again since. [Doc. 236-17, p. 6]. Per Defendant's AT&T records, this trip was the only time he traveled to Douglas County within that past week. [Doc. 236-20, pp. 2–3].

While Det. Demeester pursued the lead based on Defendant's alleged drug crime, the APD adult-missing-persons detectives obtained and executed a search warrant at Mr. Reynold's apartment that revealed the possibility of blood being present inside the bathroom and the bedroom that Defendant was occupying on the evening of Ms. Lenoir's disappearance. [*Id*. at p. 3]. At this point, Det. Demeester was led to believe that Ms. Lenoir had died, probably because of an overdose, and that Defendant knew

more than he was sharing.[7] [*Id.*]. Accordingly, Det. Demeester sought two additional warrants for Defendant's electronic records. On August 11, 2022, a superior court judge from Fulton County issued a warrant to Det. DeMeester for Defendant's Apple iCloud records (the "iCloud Warrant") based on his name, phone number, and the unique 15-digit identifier associated with a person's mobile device. [*Id*. at pp. 8–9]. A few days later, Det. Demeester also received a warrant for Defendant's Google search records (the "Google Warrant") associated with the email address provided by Defendant's probation officer. [Doc. 236-24, pp. 7–9]. In addition to possession of a controlled substance, both warrants listed the alleged crimes as murder, concealing the death of another, kidnapping, and false imprisonment. [Doc. 236-20, p. 8]; [Doc. 236-24, p. 8].

Defendant's Google records showed that throughout the night, he was searching for Narcan and "other suspicious activity," including a search for, "can someone who last saw a missing person be charged with murder[?]" [Doc. 236-17, p. 6]. Reinforced in his theory and now believing Defendant may have disposed of Ms. Lenoir's body, Det. Demeester obtained three more warrants: one for the seizure of Defendant's iPhone SE (the "iPhone SE Warrant"), one for the seizure of Defendant's iPhone 13 ProMax (the "iPhone 13 ProMax Warrant"), and one for the search of both of those phones (the "Phone Search Warrant"). [Doc 236-11]; [Doc. 236-17]; [Doc. 236-19]. Detectives

[7] Recall Defendant's prior statement to Ms. Green: "What the hell are you implying– your girl was fucked, sobered up, and left…I'll call her, but you def owe me an apology. Asshole." [Doc. 204, Green Interview Video, 01:13:20].

executed each warrant, taking Defendant's iPhone SE from his home and his iPhone 13 ProMax from his attorney's office. [Doc. 164-1, p. 1]; [Doc. 165-1, p. 1].

## LEGAL STANDARDS

In a motion to suppress, the movant bears the initial burden of persuasion, through specific factual allegations and supporting evidence, that the evidence should be suppressed. *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977). Once the movant establishes a basis for the motion, the burden then shifts to the government to prove by a preponderance of the evidence that the search or seizure of evidence was legally and factually justified. *United States v. Freire*, 710 F.2d 1515, 1519 (11th Cir. 1983) (citation omitted).

## DISCUSSION[8]

### A. IMPROPER AUTHORIZATION

A search warrant must be reviewed by "a neutral and detached magistrate" before it can be executed. *United States v. Martin*, 297 F.3d 1308, 1316 (11th Cir. 2002) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 450 (1971)). This separate review by a member of the judiciary protects us from the sometimes "hurried judgment of a law

---

[8] As stated, the Court delivers this order in two parts, beginning here with the APD warrants that Defendant challenged in six motions. [Doc. 161]; [Doc. 162]; [Doc. 163]; [Doc. 164]; [Doc. 165]; [Doc. 169]. In all six motions, Defendant argues that the APD warrants obtained in 2022 were invalid for varying reasons, so that any evidence obtained from each of these six warrants must be suppressed. [Doc. 161]; [Doc. 162]; [Doc. 163]; [Doc. 164]; [Doc. 165]; [Doc. 169]. Since the facts supporting each of Defendant's challenges are nearly identical, the Court addresses each issue in turn as it applies across the motions where it is argued.

enforcement officer engaged in the often competitive enterprise of ferreting out crime" and serves as "a more reliable safeguard against improper searches." *Id.* (quoting *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 326 (1979)). "[T]he courts must . . . insist that the magistrate purport to perform his neutral and detached function and not serve merely as a rubber stamp for the police" in determining whether a warrant contains sufficient probable cause. *Id.* (quoting *United States v. Leon*, 468 U.S. 897, 914 (1984)). Under Georgia law, a judge cannot sign a search warrant without considering a sworn affidavit or testimony. *Henry v. State*, 626 S.E.2d 511, 512–13 (Ga. App. 2006) ("The signature of the affiant is necessary to the validity of an affidavit.")

Defendant argues that four of the APD's warrants are invalid because the time difference between the affidavit and warrant signatures suggest that the magistrate judge could not have fully read the affidavit and made his own independent finding of probable cause. [Doc. 161, pp. 9–10]; [Doc. 164, pp. 4–5]; [Doc. 165, pp. 4–5]; [Doc. 169, pp. 6–7]. Specifically, Defendant points to the following four potential flaws: (1) the AT&T Warrant was signed three minutes before the affidavit was sworn [Doc 161, p. 10]; (2) the iPhone SE Warrant was signed 23 seconds after the affidavit was sworn [Doc. 164, p. 5]; (3) the iPhone 13 ProMax Warrant was signed 11 seconds after the affidavit was sworn [Doc. 165, p. 5]; and (4) the Phone Search Warrant was signed 10 seconds after the affidavit was sworn. [Doc. 169, p. 7]. Defendant argues that based on these facts alone, the warrants are invalid because the issuing judge did not have

sufficient time to review the affidavit before issuing the warrant. [Doc. 161, p. 10]; [Doc. 164, p. 4]; [Doc. 165, p. 4]; [Doc. 169, p. 7].[9] As to the AT&T warrant specifically, Defendant argues that the magistrate judge could not have reviewed the affidavit before signing the warrant because the affidavit was signed after, so the judge did not even have it available for his review. [Doc. 161, p. 10].

Defendant's argument rests entirely on the assumption that because the warrants were signed either before or mere seconds after the affidavits were signed, the issuing judge could not have considered the evidence contained in the affidavits. Nevertheless, Defendant's assumption that a judge cannot consider an affidavit until after it is signed makes little sense in the context of how warrants are actually obtained. In fact, numerous scenarios explain the timing discrepancies without suggesting that the issuing judge failed to consider the affidavit's contents.

For example, the judge could have read the affidavit in its entirety and then directed the detective to sign it—a routine practice in courts. *See United States v. Gordon*, No. 1:14-CR-312-WSD, 2015 WL 7863289, at *3 (N.D. Ga. Dec. 2, 2015), *aff'd*, 686 F. App'x 702 (11th Cir. 2017) (finding that "the 51-second difference between the time stamps, standing alone, is not relevant, because the stamps do not necessarily reflect the length of time the judge reviewed the application, and there is no minimum amount of time required for a judge to review an application before issuing a search warrant."); *see*

[9] The government did not offer any response to this argument, and, frankly, the Court does not blame it.

*also United States v. Barnett*, No. 17-CR-00676, 2023 WL 1928202, at *8 (N.D. Ill. Feb. 10, 2023) (finding that time stamps indicating the magistrate judge signed the warrant one minute after the affidavit was sworn was insignificant and, "[t]o the contrary, based upon common practice, it remains far more likely that [the issuing judge] reviewed the warrant application and, after reviewing it, the officer swore to the truth of the affidavit.") There are many other plausible explanations, but the point is that the time stamps of the signatures on each of the documents say nothing definitive about whether the judge actually read and considered the affidavit.

Neither do the cases that Defendant relies upon support his argument. For example, Defendant cites *Henry*, 626 S.E.2d at 512–13 to argue that "Georgia law requires that a judge cannot sign a search warrant in the absence of considering a sworn affidavit or testimony." [Doc. 161, p. 9]; [Doc. 164, p. 4]; [Doc. 165, p. 4]; [Doc. 169, p. 6]. That is certainly good law, but it doesn't help Defendant here. Why? *Henry* involved a warrant found to be invalid because one law enforcement officer wrote the text of the affidavit, but another, different law enforcement officer, signed and submitted the affidavit to the magistrate. 626 S.E.2d at 513 ("Here, the person named as the affiant in the text of the affidavit . . . was not the same as the person who signed the affidavit . . . .") We don't have that issue in this case.

Defendant also cites to *United States v. Decker*, which, aside from being a decision based on Missouri state law, is similarly irrelevant where the court found that the

magistrate abandoned its neutral and detached position because he "never read" the affidavit– a finding supported by the judge's own testimony before the Court. 956 F.2d 773, 777 (8th Cir. 1992) (in response to whether he had read the affidavit, the magistrate responded "I did, and I know I missed the first sentence in the search warrant that's in the application and the affidavit. I just suppose I missed it. I might not have—I glanced at it. You most generally—they're generally the same and I just—if that sentence is missing, I missed it. And I executed this search warrant on the strength of what the officer told me.") Here, no one disputes that Det. Demeester both wrote the affidavit and swore to it under oath, so these cases don't help Defendant.

Without any evidence showing that the judge truly did not consider the affidavit, the Court declines to invalidate otherwise valid search warrants based solely on the time stamps of the warrants and their affidavits. The Court therefore rejects Defendant's arguments as to improper authorization and finds that a neutral and detached magistrate properly authorized the four challenged warrants in accordance with the Fourth Amendment and Georgia Constitution.

**B. PROBABLE CAUSE**

"[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). In considering probable cause, courts consider the "totality of the circumstances" to decide whether there was a "fair probability that contraband or evidence of a crime [would] be found in

a particular place." *United States v. Delgado*, 981 F.3d 889, 897 (11th Cir. 2020) (citation omitted). "Nothing even approaching conclusive proof or proof beyond a reasonable doubt" is required. *Id.* An affidavit accompanying a warrant application supports probable cause when it "establish[es] a connection between the defendant and the [place] to be searched and a link between the [place] and any criminal activity." *Martin*, 297 F.3d at 1314. "The task of the magistrate issuing a warrant is to make a practical, common-sense decision whether, given all the circumstances set forth in the probable cause affidavit, there is a fair probability that evidence of a crime will be found in a particular place." *United States v. Bishop*, No. 15-15406, 2017 WL 1208403, at *5 (11th Cir. Apr. 3, 2017) (per curiam) (citing *Gates*, 462 U.S. at 238). "And the duty of the reviewing court is simply to ensure that the magistrate had a substantial basis for . . . conclud[ing] that probable cause existed." *Gates*, 462 U.S. at 238-39 (citation omitted). When a search is conducted pursuant to a warrant, the burden is on the defendant to show that the warrant is invalid. *United States v. Lockett*, 533 F. App'x 957, 965 (11th Cir. 2013) (citing *United States v. Osborne*, 630 F.2d 374, 377 (5th Cir. 1980)).

Defendant challenges the probable cause of four of the APD's warrants: (1) the AT&T Warrant [Doc. 161, pp. 10–14]; (2) the iCloud Warrant [Doc. 162, pp. 7–10]; (3) the Google Warrant [Doc. 163, pp. 8–11]; (4) the Phone Search Warrant [Doc. 169, pp. 7–10]. Defendant lodges a similar attack on these four warrants: probable cause was lacking because the supporting affidavit failed to tie the requested records to the crime alleged

in the warrant. [Doc. 161, p. 13]; [Doc. 162, p. 10]; [Doc. 163, p. 10]; [Doc. 169, p. 10]. In each motion, Defendant lists each item that is sought and complains that the warrant does not explain how each requested record by the warrant is linked to evidence of the crimes at issue. [Doc. 161, p. 13]; [Doc. 162, p. 10]; [Doc. 163, pp. 10–11]; [Doc 169, p. 10]. In response, the government directs the Court to each statement in the warrant affidavit showing otherwise. [Doc. 186, pp. 1–2]; [Doc. 187, pp. 1–2]; [Doc. 188, pp. 1–2]; [Doc. 196, pp. 1–2]. Undaunted by the Government's responses, the Defendant doubled down in his reply briefs. The Court addresses each warrant below.

**1. AT&T Warrant [Doc. 161]**

The AT&T Warrant requested Defendant's call, voice, text (SMS & MMS), and data connection location information and transactions, stored communication or files, remote storage and cloud accounts, payment methods, date and time of payments, and location of payments, and/or customer service and account notes for search of evidence of possession of a controlled substance. [Doc. 161-1, pp. 1–3]. Det. Demeester's affidavit states that the records were of evidentiary value because they would assist in establishing "the identity of the person that regularly and usually maintained and utilized a specific mobile device associated with a phone number during the time of relevance to the investigation" and would help identify any other individuals who may have been involved. [*Id.* at p. 5]. The next paragraph of the affidavit then provided a robust explanation of what establishing the "identity" of a suspect entails, as well as the

practice being standard in "supporting the State's burden of proving identity of ownership and use of a mobile device." [*Id.*]. Throughout the affidavit, Det. Demeester outlined the facts surrounding the disappearance of Ms. Lenoir on or around August 1, 2022, including the fact that Defendant was one of the last people known to have seen Lenoir before her disappearance and that Ms. Lenoir's phone was in communication with Defendant's phone number shortly before her disappearance. [*Id.* at pp. 4-5]. Additionally, Det. Demeester's affidavit described information provided by Ms. Green, who was with Ms. Lenoir and Defendant prior to Ms. Lenoir's disappearance, including that Defendant and Mr. Reynolds provided and consumed various drugs while at the apartment. [*Id*. at p. 4]. Accordingly, the Court finds that the magistrate judge had a substantial basis for finding a fair probability that Defendant's phone records would include evidence of his possession of controlled substances as listed in the warrant affidavit.[10] *See United States v. Owden*, 345 F. App'x 448, 454–55 (11th Cir. 2009) (per curiam) (affirming the district court's finding of probable cause based on similar facts).

**2. <u>iCloud Warrant [Doc. 162]</u>**

The iCloud Warrant similarly requested numerous records, this time

---

[10] Defendant in the same breath argues that Det. Demeester "was struggling to find information to tie [Defendant] to the crime he wanted to investigate (a missing person) so he was trying to find some crime that he could tie to him so that he could secure a warrant. Basically, he had a hunch and he wanted to act on it but he failed to show any evidence that would support the issuance of the warrant." [Doc. 161, p. 14]. However, Defendant's argument is irrelevant to his probable cause challenge. *United States v. Lanzon*, 639 F.3d 1293, 1300 (11th Cir. 2011) ("A police officer's subjective reasons for a search do not control the legal justification for his actions, as long as objective circumstances justify the search.")

substantiated by what the AT&T Warrant results revealed. [Doc. 162-1]. Importantly, the iCloud Warrant, and each subsequent warrant, listed the alleged crimes as murder, concealing the death of another, kidnapping, false imprisonment, and *possession of a controlled substance.* [*Id*. at p. 1]. In addition to the facts included in the prior AT&T Warrant, the iCloud Warrant affidavit also included a summary of Defendant's phone activity surrounding Ms. Lenoir's disappearance, obtained from the lawfully issued AT&T Warrant, including phone calls he made to various pharmacies, non-emergency phone numbers for various fire departments, local hospitals and urgent care facilities, drug rehabilitation centers and organizations that distribute Narcan, a medication which is well-known to help counteract the effects of opioid overdoses. [*Id*. at p. 2]. Further, the affidavit avers that Defendant's phone records document an Apple iPhone 13 ProMax which was subscribed to him on the relevant dates and times and was also being used to place and receive phone calls. [*Id*. at p. 3]. Moreover, a search of the residence where Ms. Lenoir had last been seen revealed the possible presence of blood and that Defendant, who had been the last to see her, was denying any involvement or knowledge of her whereabouts despite the records suggesting that he knew more than what he was saying. [*Id.*]. So, the magistrate had a substantial basis for finding a fair probability that Defendant's Apple iCloud records would include evidence of the offenses of investigation listed in the warrant affidavit, including murder, concealing the death of another, kidnapping, false imprisonment and possession of a controlled a

substance. *See United States v. McCall*, 84 F.4th 1317, 1320 (11th Cir. 2023) (affirming the lower court's finding of probable cause based on similar facts).

### 3. **<u>Google Warrant [Doc. 163]</u>**

As to the Google Warrant, Defendant's argument that the affidavit "fails to show a nexus between the Google account and the potential for evidence of the crime at issue" also plainly fails. [Doc. 163, p. 10]. Two pages of the affidavit explain the types of evidence that may be collected from Google records including historical location data as well as metadata attached to various files which "frequently store GPS coordinates" and may indicate "where a photo was taken." [163-1, p. 5]. It seems obvious why this information would be invaluable to the early stages of an investigation where a Defendant's whereabouts, and that of any potential accomplices, is directly relevant. Nevertheless, the affidavit further explains that this information "may assist Law Enforcement in locating the area the missing person body was disposed of." [*Id.* at p. 6]. As to Defendant's argument that "[t]here is an absence of information in the warrant that would suggest that evidence of the crimes at issue would be found in these requested records" [Doc. 163, p. 11], Det. Demeester's affidavit consistently references his training and experience as having informed his statement that not only do most people carry phones with them which would store this sort of data, but also that suspects involved in criminal activity often use phones to communicate with others who may be involved. [Doc. 163-1, p. 5]; *see United States v. Bradley*, 644 F.3d 1213, 1263–

64 (11th Cir. 2011). Defendant's argument that there was no evidence he had spoken to Ms. Lenoir via email defies the governing totality-of-the-circumstance standard. *Delgado*, 981 F.3d at 897 ("[I]n considering probable cause, we do not isolate events, but consider the totality of the circumstances to decide whether there was a fair probability that contraband or evidence of a crime [would] be found in a particular place." (citation omitted)). Hence, the Court finds that the magistrate judge had a substantial basis for finding a fair probability that Defendant's Google records would include evidence of the offenses of investigation listed in the warrant affidavit, including murder, concealing the death of another, kidnapping, false imprisonment and possession of a controlled a substance.

**4. <u>Phone Search Warrant [Doc. 169]</u>**

Defendant's final probable cause challenge as to the Phone Search Warrant also fails. [Doc. 169, pp. 7-10]. In addition to the facts already stated in each affidavit, this affidavit included a summary of Defendant's phone activity surrounding Ms. Lenoir's disappearance, obtained from a lawfully issued search warrant, including phone calls he made to various pharmacies, non-emergency phone numbers for various fire departments, local hospitals and urgent care facilities, drug rehabilitation centers and organizations that distribute Narcan, a medication which is well-known to help counteract the effects of opioid overdoses. [Doc. 169-1 at p. 6]. Once again, the magistrate judge had a substantial basis for finding a fair probability that evidence of

the offenses alleged would be found in Defendant's cell phones.

### C. PARTICULARITY

The text of the Fourth Amendment requires a search warrant to describe particularly the place to be searched and the things to be seized. U.S. Const. amend. IV. A search warrant's "description is sufficiently particular when it enables the searcher reasonably to ascertain and identify the things to be seized." *United States v. Santarelli*, 778 F.2d 609, 614 (11th Cir. 1985). Courts apply the Fourth Amendment's particularity requirement "with a practical margin of flexibility, depending on the type of property to be seized." *United States v. Wuagneux*, 683 F.2d 1343, 1348 (11th Cir. 1982). Thus, in determining the sufficiency of a warrant's description, courts consider whether the description "is as specific as the circumstances and nature of activity under investigation permit." *Id.* "A warrant which fails to sufficiently particularize the place to be searched or the things to be seized is unconstitutionally over broad [sic]." *United States v. Travers*, 233 F.3d 1327, 1329 (11th Cir. 2009). Still, "elaborate specificity in a warrant is unnecessary" to satisfy the particularity requirement. *United States v. Peagler*, 847 F.2d 756, 757 (11th Cir. 1988).

Defendant's particularity challenges of the four warrants can similarly be boiled down and addressed in one fell swoop. In four motions to suppress, Defendant recites the prohibition against general warrants and then conclusively argues that the warrant at issue was "virtually unlimited" in scope, sought "every type of information

imaginable," and failed to limit the requested records or data to evidence of the crimes identified in the warrant. [Doc. 161, p. 11]; [Doc. 162, p. 8]; [Doc. 163, pp. 8–9]; [Doc. 169, pp. 7–9]. Depending on the warrant, Defendant emphasizes the breadth of the categories requested and the absence or asserted inadequacy of temporal restrictions. [Doc. 161, p. 11]; [Doc. 162, p. 8]; [Doc. 163, pp. 8–9]; [Doc. 169, pp. 7–9]. In support of each motion, Defendant relies principally on *United States v. Blake*, 868 F.3d 960 (11th Cir. 2017), to characterize each warrant as the digital equivalent of a prohibited general warrant. [Doc. 161, pp. 11–12]; [Doc. 162, pp. 8–9]; [Doc. 163, pp. 8–9]; [Doc. 169, p. 9]. The Court disposes of Defendant's challenges by looking no further than the four corners of the warrant.

First and foremost, Defendant's broad reliance on *Blake* across his four motions is misplaced. In *Blake*, the Eleventh Circuit found a warrant lacked particularity where the warrant sought all Facebook records for a defendant, to include messages, photos, and other highly private information. 868 F.3d at 974. Importantly, the Eleventh Circuit took issue with the fact that not only was the request qualitatively robust, but the warrant failed to limit the data requested to only the temporal period of the alleged criminal activity providing the basis for the warrant. *Id.* Turning to the warrants in this case, the AT&T records warrant, Google records warrant, and Phone Search Warrant each include a narrow temporal scope that limited the searches to the weeks surrounding Ms. Lenoir's disappearance. [Doc. 161-1, p. 9]; [Doc. 163-1, p. 7]; [Doc. 169-2, p. 3].

Although the iCloud warrant did not include a similar time-based reference, it was otherwise limited in scope because it only sought discrete categories of data, so "the lack of a time limitation did not render the warrant unconstitutional." *Blake*, 868 F.3d at 973 n.7 (stating that although it is somewhat troubling that the Microsoft warrant did not limit emails sought to the period of Defendant's suspected involvement with the conspiracy, the warrant was nevertheless appropriately limited by categories of emails sought).

Further, unlike *Blake*, the APD warrants here did not come close to revealing the personal intimacies of life so broadly and prematurely. In fact, each warrant shows a methodical broadening, beginning with the very narrow and limited AT&T warrants that essentially revealed only log histories and location data, limited in temporal scope. [Doc. 161-1, p. 9]; [Doc. 163-1, p. 7]; [Doc. 169-2, p. 3]. After the investigation developed probable cause, only then did the APD seek a warrant to search Defendant's phones, which was more akin to the search in *Blake*, and even then, the applicable warrant limited the search to the time surrounding Defendant's suspected involvement in Ms. Lenoir's disappearance and to evidence of the crimes alleged. *McCall*, 84 F.4th at 1328 (explaining that there are generally two types of limitations that can particularize warrants for digital evidence: narrowing the search based on the subject matter of the data or based on a temporal limitation). In other words, the warrants in this case were significantly narrower than those in *Blake*, so that *Blake* cannot be the proper measuring

stick where the present warrants did not permit such free-ranging search of Defendant's phone contents. *See Maryland v. Garrison*, 480 U.S. 79, 84 (1987) ("The manifest purpose of th[e] particularity requirement was to prevent general searches.")

The Court finds each warrant to be sufficiently particularized because they leave no discretion to the executing law enforcement officer. The AT&T records warrant, Google records warrant, and Phone Search warrant include a narrow temporal scope limited to the period surrounding Defendant's suspected involvement with Ms. Lenoir's disappearance and possible overdose. [Doc. 161-1, p. 9]; [Doc. 163-1, p. 7]; [Doc. 169-2, p. 3]. Although the iCloud warrant did not include a time-based scope, the Court finds it otherwise limited in scope because it only sought discrete categories of data, so "the lack of a time limitation did not render the warrant unconstitutional." *Blake*, 868 F.3d at 973 n.7. Moreover, each warrant was limited to a specific account, telephone number, or device attributed to Defendant. [Doc. 161-1, p. 9]; [Doc. 162-1, p. 8]; [Doc. 163-1, p. 7]; [Doc. 169-2, p. 3]. Accordingly, the Court finds all four warrants challenged by Defendant to have been sufficiently particularized and constitutional.[11]

---

[11] Defendant makes numerous attacks to the credibility of the affidavit throughout his challenge of each warrant's particularity. For example, Defendant argues that "it is not accurate or truthful when the detective asserts that there isn't a process to limit or restrict searches of data contained on person's cell phone or iOS backups," to name one. However, "[t]he Fourth Amendment by its terms requires particularity in the warrant, not in the supporting documents." *Groh v. Ramirez*, 540 U.S. 551, 557 (2004). Accordingly, Defendant's attacks to the affidavit are irrelevant here. *United States v. Pratt*, 438 F.3d 1264, 1269–70 (11th Cir. 2006) ("[T]he contents of the search warrant itself, not the contents of the supporting documents, are scrutinized under the Fourth Amendment's particularity requirement.")

### D. DEFENDANT'S REQUEST FOR A *FRANKS* HEARING

The "decision about whether to hold an evidentiary hearing lies within [the] court's sound discretion . . . ." *United States v. Arbolaez*, 450 F.3d 1283, 1293 (11th Cir. 2006), *abrogated in part on other grounds by, Michigan v. Bryant*, 562 U.S. 344, 355 (2011). "Affidavits supporting…warrants are presumptively valid." *United States v. Kapordelis*, 569 F.3d 1291, 1309 (11th Cir. 2009) (citing *Franks v. Delaware*, 438 U.S. 154, 171 (1978)). To be entitled to a *Franks* hearing, a defendant must make a "substantial preliminary showing that the affiant made false statements, either intentionally or with reckless disregard for the truth, pointing specifically to the portions of the affidavit claimed to be false, and that the false statements were necessary to the finding of probable cause." *Id.* "When assessing whether the alleged false statements and omissions were material, the trial court is to disregard those portions of the affidavit which the defendant has shown are arguably false or misleading." *Id.* "[E]ven intentional or reckless omissions will invalidate a warrant only if inclusion of the omitted facts would have prevented a finding of probable cause." *Id.* (citation omitted). If probable cause still exists once the Court excludes any false statement, the Court doesn't need to hold a *Franks* hearing. *See id.* "The defendant bears the burden of showing that, absent those misrepresentations or omissions, probable cause would have been lacking." *Id.* (citation omitted).

Across five motions, Defendant argues that the magistrate judge issued five warrants to the APD based on supporting affidavits that contained misstatements or

omissions that irreparably tainted any finding of probable cause. [Doc. 161, pp. 13–16]; [Doc. 162, pp. 10–13]; [Doc. 163, pp. 11–13]; [Doc. 164, pp. 4–6]; [Doc. 165, pp. 4–6]. Several of Defendant's challenges fail at the threshold because they rest on factual premises the record does not support, or even squarely contradicts, and can be resolved without extended discussion. Because Defendant's core *Franks* arguments recur nearly verbatim across his five motions, the Court addresses each alleged *Franks* violation generally to determine whether Defendant has made the substantial preliminary showing required to warrant a hearing or suppression, looking to the specific motion where necessary.

**1. <u>Alleged Omissions in the Affidavits</u>**

First, Defendant argues that Det. Demeester failed to inform the magistrate that Ms. Green was not credible because she was under the influence of various substances on the night in question and because she initially denied, before later admitting, that she and Reynolds exchanged sex for money. [Doc. 161, p. 15]; [Doc. 162, p. 11]; [Doc. 163, p. 13]; [Doc. 164, p. 6]; [Doc. 165, p. 6]. Absolutely not true. Each challenged affidavit clearly disclosed that Ms. Green was under the influence, including the fact that she left the apartment the evening of Ms. Lenoir's disappearance before Ms. Lenoir because she "was intoxicated and wanted to leave." [Doc. 163-1, p. 3]. Each affidavit further recounts a wealth of facts developed independently through Det. Demeester's own investigation, including his review of phone records and video surveillance of the

1660 Peachtree Street apartment, which corroborated Ms. Green's account. [Doc. 161-1, p. 4]; [Doc. 162-1, p. 12]; [Doc. 163-1, p. 3-4]; [Doc. 164-1, p. 6]; [Doc. 165-1, p. 6]; [Doc. 169-2, p. 6]. Accordingly, this argument fails to make a substantial showing of an omission of facts sufficient to call the legality of the warrant into question.[12]

As to Det. Demeester's statement in the affidavit that a luminol test done in the apartment revealed the possibility of blood, Defendant argues that Det. Demeester should have disclosed that the luminol test was performed nine days after the night of Ms. Lenoir's disappearance and that luminol can react to substances other than blood, including bleach. [Doc. 162, p. 12]; [Doc. 163, pp. 12–13]; [Doc. 164, pp. 6–7]; [Doc. 165, pp. 6–7]. However, Defendant offers no evidence that Det. Demeester knew, or should have known, that another substance *could* explain the luminol reaction, and the Court will not speculate about chemistry the record does not substantiate. Even setting aside the lack of evidentiary support, the affidavit need only establish a "fair probability" that

---

[12] The Court notes that, to the extent that Det. Demeester did not clearly question Ms. Green's credibility despite telling the magistrate judge that she was intoxicated, the omission was immaterial because Det. Demeester included significant detail about his independent corroboration of Ms. Green's narrative through his review of Ms. Lenoir's cell phone records as well as the surveillance footage at the apartment parking garage. [Doc. 161-1, pp. 4–5]. Accordingly, any further inclusion of the information about Ms. Green's drug use "in light of the other information corroborating her statements during the initial interview, does not undermine the reliability of her statements recounted in the affidavit." *United States v. Nathans*, No. 1:18-CR-00168-TCB-JFK, 2019 WL 4397355, at *7 (N.D. Ga. Apr. 26, 2019), *report and recommendation adopted sub nom. United States v. Culton*, No. 1:18-CR-168-TCB-2, 2019 WL 3183572 (N.D. Ga. July 16, 2019); *see also Martin*, 297 F.3d at 1314 (noting that "sufficient independent corroboration of an informant's information" can provide a basis for establishing veracity) (citation omitted)).

evidence of a crime will be found.[13] *See Martin*, 297 F.3d at 1310 (citing *Gates*, 462 U.S. at 238). Accordingly, this omission was immaterial to the magistrate judge's finding of probable cause.

Defendant argues that the AT&T Warrant affidavit omitted that Defendant was sleeping in a different room for most of the evening. [Doc. 161, p. 16]. However, Ms. Green's interview recording shows that Defendant spent the "majority of the night" with the group in the kitchen, slept only after ingesting mushrooms, and then rejoined the group at some point before Ms. Green left around 12:30 PM. [Doc. 204, Green Interview Video, at 27:30]. Accordingly, Defendant's argument here fails to make a substantial showing that a material fact was omitted because Defendant's supposed omission is directly contradicted by video evidence.

Defendant argues that the Google Warrant affidavit should have disclosed that in interviews conducted in the days after Ms. Lenoir went missing, apartment staff reported that they believed she left the complex the next day in a gray Jeep. [Doc. 163, p. 13]. Again, Defendant has identified nothing in the record substantiating this claim, and the Court has found none. Even if true, that evidence would have shown that Defendant possessed a gray jeep that he drove to the apartment the night of Ms. Lenoir's disappearance and well into the next day when Ms. Lenoir's phone was

[13] Defendant's alternative explanation for physical evidence is a matter for trial, not a basis for attacking an affidavit that otherwise supports probable cause.

observed traveling with Defendant. [Doc. 204, Green Interview Video, at 01:03:00]; [Doc. 163-1, p. 3]. In other words, even if the apartment staff actually reported this and Det. Demeester omitted it from the affidavit, it would seem to only cut against Defendant's argument here. Accordingly, Defendant has not made a substantial showing that the alleged statement was either an omitted fact or material, much less both.[14]

As to the Google Warrant, Defendant argues that Det. Demeester's affidavit omitted that an earlier warrant for Google records had already come back with no account tied to the same phone number. [Doc. 163, p. 12]. At the May 18, 2022 hearing, Det. Demeester explained that, at the time he sought the warrant, he had identified two potential Gmail accounts attributable to Defendant. [Doc. 237, p. 89]. On cross-examination, Det. Demeester stated that he was "not sure of the results" of the first warrant but confirmed that the second warrant sought records attributed to a Gmail address that Defendant's probation officer had separately provided and confirmed was active and that this warrant did return results. [*Id*.]. Perhaps there would be merit to Defendant's argument if the second Google Warrant simply "guessed" at another email

[14] The Court pauses to note that Defendant's cherry-picking of evidence and oftentimes incredulous framing of facts (some of which the Court found plainly false) made the drafting of this order unnecessarily cumbersome, difficult, and lengthy. Not only did the Court have to analyze every argument on its merit, but the Court had to tediously scour the record to validate most of Defendant's arguments and factual claims because so many were flat-out unreliable or just plain disingenuous. Defendant can rest assured that because he has shown the Court it cannot rely on his assertions or citations, the Court will continue to triple-check every cite and every factual assertion he makes throughout the case. This just didn't have to be.

address. However, this was not the case and it seems obvious why having an incorrect or inactive email address the first time a warrant is sought would not extinguish probable cause in a second warrant where the email address is provided and confirmed active by Defendant's probation officer.[15] The Court finds once again the that the omission doesn't doom the magistrate judge's probable-cause finding.

In sum, Defendant's argument would impose a Constitutional requirement requiring a law enforcement officer to effectively present a magistrate judge with everything known to him, no matter how trivial, but that is not the law. While an affiant may not omit facts so critical that their absence renders the affidavit materially misleading, an officer has no obligation to present every potential fact that a defendant might later marshal in his favor. *See Kapordelis*, 569 F.3d at 1309–10; *see also United States v. Thomas*, No. 7:18-CR-400-LCB-JHE-2, 2025 WL 4230981, at *5 (N.D. Ala. Dec. 2, 2025), *report and recommendation adopted*, No. 7:18-CR-400-LCB-JHE-2, 2026 WL 404044 (N.D. Ala. Feb. 12, 2026) ("an affiant has no obligation to present facts favorably to a suspect or include every detail that could potentially cut against probable cause for her affidavit to be truthful.") Defendant's alleged omissions, considered individually and cumulatively, do not rise to the level of a substantial preliminary showing sufficient to

[15] The affidavit provided the source of this email address by stating that "[Defendant] is on active probation in Georgia. His probation officer C. Simmons provided what contact information she has of his to include a gmail [sic] stevenoboite@gmail.com. Officer Simmons confirmed she has communicated with Mr. Oboite via this email since 2019." [Doc. 163-1, p. 4].

warrant a *Franks* hearing, much less suppression of the warrants at issue.

### 2. Affirmative Misrepresentations

In addition to the challenged omissions, Defendant alleges several affirmative misrepresentations in the affidavits that he argues call for a *Franks* hearing. As with the omissions above, most of these arguments fail because Defendant didn't identify a statement that is actually false or misleading. The remainder of Defendant's challenges fail because they are simply immaterial.

Defendant first argues that the AT&T warrant is invalid because Det. Demeester told the magistrate judge that he was investigating possession of a controlled substance, but that was just a pretextual cover for a missing-person investigation. [Doc. 161, p. 15]. As support, Defendant directs the Court to a phone call between Det. Demeester and Ms. Green where Det. Demeester tells Ms. Green, "I need a crime." [Doc. 204, Green Phone Audio, 14:25]. Although the Court finds that Defendant's characterization of this exchange between Det. Demeester and Ms. Green is taken out of context, it chooses to succinctly address this argument because the law is dispositive: whether a warrant affidavit provided the magistrate with sufficient probable cause to issue the warrant is an objective inquiry. *See, e.g.*, *Kentucky v. King*, 563 U.S. 452, 464 (2011). Even if Defendant could prove Det. Demeester's subjective motive, it wouldn't matter. *See United States v. Causey*, 834 F.2d 1179, 1184 (5th Cir. 1987) ("so long as police do no more than they are objectively authorized and legally permitted to do, their motives in doing

so are irrelevant and hence not subject to inquiry."); *see also United States v. Jones*, 377 F.3d 1313, 1314 n.1 (11th Cir. 2004) (citing *Causey* for the proposition that "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."); *United States v. Morton*, 46 F.4th 331, 336 n.2 (5th Cir. 2022) (explaining that an affiant's alleged pretextual motive to investigate a suspected sexual predator rather than the drug crimes he presented to the magistrate judge was irrelevant to the Fourth Amendment probable cause analysis where the test is objective).[16]

Defendant next argues that Det. Demeester mislead the magistrate judge by suggesting that the phone records could identify unknown "co-conspirators" when he apparently knew Mr. Reynolds was the sole drug supplier. [Doc. 161, p. 15]. Even assuming this to be true, Ms. Green clearly reported that all four, including Defendant,

---

[16] To the extent that the Eleventh Circuit has not so plainly echoed this pervasive rule following the Supreme Court's decision in *Whren*, the Court reiterates that drug crimes remained the core of Det. Demeester case throughout his investigation. Det. Demeester testified that the theory of murder throughout the warrants was "felony murder" and the basis was a drug overdose. [Doc. 237, p. 90]. When asked on cross-examination what crime he was investigating, he stated, "[t]he sale, distribution of drugs as well as murder and concealing the death of another." [*Id*. at p. 74]. After the Court asked Det. Demeester whether he was "really serious" about the drugs or if "that was just a way to get in the apartment to maybe try to find this girl[]" [*Id*. at p. 75], he responded, "Yes, sir…I wasn't even part of the search warrant in the apartment. That -- the case hadn't even been assigned to me yet…[O]ur adult missing persons detectives were initially investigating her disappearance. And they got a search warrant and executed the search warrant at the apartment that she was last seen, and they did some forensics analysis to include Luminol and found some suspicious items, and then that's when they assigned the case to me." [*Id*. at p. 78].

Importantly, the statement raised by Defendant as an attack to Det. Demeester's motive is taken out of context. On this phone call, Det. Demeester was explaining to Ms. Green why he could not go and arrest Defendant, clearly trying to convey the probable cause requirement in layman's terms. Nevertheless, Det. Demeester did not seek a warrant to search the apartment or arrest Defendant. To the contrary, he sought a warrant for AT&T records based on the facts surrounding possession of controlled substances.

consumed substances while hanging out at the apartment. [Doc. 204, Green Interview Video, 29:30]; [Doc. 204, Green Phone Audio, 00:30]. In other words, all four, not only Mr. Reynolds, allegedly possessed controlled substances, the crime alleged in the warrant affidavit. *See* O.C.G.A. §16-13-30(a) ("Except as authorized by this article, it is unlawful for any person to purchase, possess, or have under his or her control any controlled substance.") Moreover, the AT&T warrant affidavit specifically states, "[t]he records will also be analyzed to identify any individuals that was in communication within close temporal proximity to the crimes enumerated above." [Doc. 161-1, p. 5]. Accordingly, the Court finds the affidavit is neither false nor misleading and Defendant has failed to show any materially false statement.

Defendant next argues that Det. Demeester mislead the magistrate judge by suggesting that he needed the AT&T records to establish Defendant's identity when officers had already contacted him at that number. [Doc. 161, p. 16]. That is, since Det. Demeester already knew his name and phone number, what more could be learned about his identity? However, Det. Demeester's affidavit explains just that in the following paragraph: "[i]dentity can be ascertained through calling patterns such as identifying parties with which the target number communicates most frequently and by identifying locations frequented by the individual in possession of the device." [Doc. 161-1, p. 5]. Moreover, Defendant's narrow definition of establishing a suspect's identity simply is not supported in its criminal law context. "Identity" in the context of

investigating a suspect for criminal activity is clearly not limited to a name and phone number. For example, subscriber and related carrier records may assist investigators in determining who actually possessed, controlled, and regularly used a particular number or device. *See United States v. Jules*, 244 F. App'x 964, 969–71 (11th Cir. 2007) (per curiam). When considering the phrase "establish identity" in its ordinary, commonsense meaning under criminal law (i.e., to confirm subscriber information and link the defendant to criminal conduct) it becomes obvious that Det. Demeester's statement wasn't false at all. The Court finds the alleged statement is neither false nor material.

Defendant next argues that it was misleading for Det. Demeester to state in his affidavits that a search was executed "at Steven and Diante['s] apartment," because this implied that Defendant lived there when Det. Demeester knew that "[Defendant] did not live in the apartment." [Doc. 162, p. 11]; [Doc. 163, p. 12]; [Doc. 164, p. 6]; [Doc. 165, p. 6]. Defendant once again takes a statement out of context. Each affidavit including this statement specifically states that "[a] search warrant was executed at Steven and Diante [sic] apartment at 1660 Peachtree Street where Ms. Lenoir was last seen." [Doc 162-1, p. 3]; [Doc. 163-1, p. 4]; [Doc. 164-1, p. 6]; [Doc. 165-1, p. 6]. Further, this statement appears only towards the end of the affidavit's facts section, after every preceding reference to the apartment identified it either as "the location" or by its full address. Read in context, Det. Demeester was clearly using shorthand to identify the location at issue, rather than asserting that Defendant resided there.

Still, Defendant overstates what the record shows on this point. Ms. Green told Det. Demeester only that, "[t]o [her] knowledge[, Defendant] does not live there," while acknowledging she did not know where he lived because he would not tell her.[17] [Doc. 204, Green Interview Video, 37:40]. However, Ms. Green's account of the evening reflects that Defendant returned repeatedly to one particular unshared room to sleep and have sexual intercourse [*Id.* at 38:10], and Det. Demeester's review of Defendant's AT&T records independently corroborated Defendant's repeated returns to the address. [Doc. 162-1, p. 2]; [Doc. 163-1, p. 3]; [Doc. 164-1, p. 6]; [Doc. 165-1, p. 6]. In other words, Det. Demeester's affidavit described the apartment consistent with Defendant's own use of the premises that night, and neither the affidavit's phrasing nor any inference of Defendant's temporary presence there rises to the level of a false statement. Because Defendant has not shown that this description was false, let alone material, this argument also fails.

Finally, Defendant argues Det. Demeester mislead the magistrate judge when stated in his affidavit that Defendant had retained counsel, because this suggested an inference of guilt. [Doc. 162, p. 12]; [Doc. 163, p. 13]; [Doc. 164, p. 7]; [Doc. 165, p. 7]. However, Det. Demeester's statement is clearly concluding his recitation of the facts that ultimately explains why he sought a warrant, specifically, consent was no longer an

[17] The Court notes the irony of Defendant attacking Ms. Green's credibility in six of his ten motions yet relying on her testimony to support his own arguments.

option. [Doc. 162-1, p. 3]; [Doc. 163-1, p. 4]; [Doc. 164-1, p. 7]; [Doc. 165-1, p. 6]. Because the statement is accurate and was not offered to establish probable cause through an adverse inference, Defendant has not identified a false or misleading statement, and this argument likewise fails to satisfy *Franks*.

Having considered each of Defendant's challenges to the APD warrants, the Court finds that he has not met his burden to make a substantial showing that a misleading or omitted fact was material to the magistrate judge's finding that sufficient probable cause existed to issue the warrants. Accordingly, the Court **DENIES** Defendant's request for a *Franks* hearing. The Court further **DENIES** Defendant's motions to suppress the evidence of the APD warrants because of any alleged misleading facts or omissions.

## CONCLUSION – APD WARRANTS

To summarize, the Court finds that the Fulton County magistrate judge properly issued each of the APD warrants in 2022. But, neither the facts of this case nor Defendant's challenges end here. To that end, Defendant's only remaining challenge as to the APD's conduct specifically pertains to whether the APD reasonably executed the warrants. [Doc. 161, pp. 16–19]; [Doc. 162, pp. 13–15]; [Doc. 163, pp. 14–16]; [Doc. 164, pp. 7–10]; [Doc. 165, pp. 7–10]; [Doc. 169, pp. 10–14].

The remainder of Defendant's motions challenge the FBI and DNR's searches and seizures as violating the Fourth Amendment. *See generally* [Doc. 167]; [Doc. 168];

[Doc. 169]; [Doc. 170]; [Doc. 176]. Recall that the FBI's investigation effectively bookended the APD investigation, running from 2021 through 2025. The Court now turns to lay out the facts concerning the FBI's investigation that the government has established by a preponderance of the evidence.

**FACTUAL BACKGROUND – FBI WARRANTS**

In March 2021, the FBI, Homeland Security Investigations (HSI), Drug Enforcement Administration (DEA), Internal Revenue Service (IRS) and the United States Postal Inspection Service (USPIS) opened an investigation into "WallStreetBets" ("WSB"), a darknet vendor involved in the shipping of controlled substances through the United States Postal Service ("USPS"). [Doc. 18-1, p. 49]. The FBI's intelligence gathering on the darknet showed that WSB advertised Oxycontin pills, Xanax, and marijuana for sale on its page and that WSB had completed over 3,000 transactions at the time. [*Id.* at p. 8].

On June 24, 2021, USPIS Atlanta was contacted by USPIS Oxford, Mississippi and informed of a seizure of M30 Oxycodone pills that tested positive for fentanyl that had been mailed from the Northern District of Georgia. [*Id.* at p. 49]. Agents in Oxford, Mississippi arrested the intended recipient who informed the agents that the pills were bought on the darknet from WSB. [*Id.*]. Meanwhile, in Atlanta, agents researching the sender business name and Kennesaw, Georgia address printed on the shipping label found that the business did not exist and the address showed a single-family residence.

[*Id.*].

Months later, while still investigating the seized parcel, Kentucky investigators contacted agents regarding an overdose in the area that appeared connected to WSB. First responders had revived two individuals who had overdosed. They informed law enforcement that they had consumed M30 oxycodone pills. Agents ultimately tracked the parcels to Darien Bargo of Barbourville, Kentucky, who later admitted to purchasing the Oxycodone from WSB on the White House Market.[18] [*Id.*]. Bargo also provided law enforcement with the PO Box address he used to receive narcotics shipments, which ultimately revealed two parcels that originated from metro Atlanta that were consistent with parcels believed to be associated with WSB based on shipping method, weight, and manner of introduction into the mail stream. [*Id.* at p. 9]. By analyzing packages known to be from WSB, investigators established a consistent shipment pattern. [*Id.*].

Investigators observed that WSB often used fraudulent business names associated with return addresses of single-family residences and that most parcels linked to WSB were mailed from collection boxes in the Atlanta area, presumably because of the ability to drop off deliveries without assistance from a postal clerk. [*Id.* at p. 49]. WSB also typically used small, padded envelopes in several different colors with

[18] The White House Marketplace "is a hidden commercial website that operates on a portion of the internet that is often referred to as the TOR network, darkweb, or darknet." [Doc. 18-1, p. 3].

prepaid computer generated EasyPost postage affixed to the front. [*Id*.]. During this same time when agents continued to expand their leads, the parcel seized in Oxford in June 2021 revealed a latent print that returned to Jabari Ayinde Cooper who lived in Atlanta. [*Id*. at p. 8].

Agents continued to track down parcels sent by WSB based on the established pattern that led them to a residence in Athens, Georgia. [*Id*. at p. 9]. Research of the recipient address revealed that Sam Bergsagel appeared to be the intended recipient. [*Id*.]. Unfortunately, Bergsagel died just weeks prior from a drug overdose of fentanyl, methamphetamine, and MDMA. [*Id*. at pp. 9-10].

Another lead appeared in April 2022 when an unknown male (at that time) mailed a large number of parcels in a single transaction at the retail counter of a Post Office in Chamblee, Georgia. [*Id*. at p. 10]. While sorting the parcels, the clerk who accepted them noticed that the shipping labels consisted of various business names and returns addresses. [*Id*.]. One, in particular, was labeled "Media Mail," so, pursuant to the Mailing Standards of the United States Postal Service, the clerk opened the parcel and found what appeared to be THC products– a nonmailable item.[19] [*Id*.]. The clerk then gathered all parcels dropped off by the individual during the transaction and

[19] "Media Mail and Library Mail are not sealed against postal inspection. Regardless of physical closure, the mailing of articles at Media Mail or Library Mail prices constitutes consent by the mailer to postal inspection of the contents." U.S. Postal Serv., *Domestic Mail Manual* § 173.2.2, https://pe.usps.com/text/dmm300/173.htm (last visited Aug. 2, 2026).

referred them to USPIS Atlanta. [*Id.*].

The following day, the same male returned to the post office and dropped off additional parcels packaged in the same manner. [*Id.*]. The clerk, per USPIS Atlanta's instructions, processed the parcels in accordance with postal policy and sent them through the mail stream. [*Id.* at pp. 10-11]. Upon receipt, agents reviewed the parcels and noted several characteristics consistent with WSB's established mailing pattern and that all return addresses were in Atlanta. [*Id.* at p. 11]. Days later, when the male returned to inquire about why his shipments had not made it to their intended destination, he identified himself as Rashad Kinloch and provided his phone number. [*Id.*]. Using surveillance footage, agents were able to confirm that Kinloch was the same man who went into the Post Office and shipped the previous large group of parcels. [*Id.*]. Agents then executed a federal search warrant on all parcels, finding narcotics in each one. [*Id.*].

In June 2022, agents analyzed USPS business records and identified an additional 64 parcels attributed to WSB that had been mailed from the North Atlanta Carrier Annex on April 26, 2022, through the Self-Service Kiosk. [*Id*. at pp. 11-12]. Surveillance footage of the transaction revealed two African American men, one of whom was holding a black garbage bag– the same method of transport used by Rashad Kinloch when he dropped off parcels at the Chamblee Post Office. [*Id*. at p. 12]. In fact, one of the two men closely resembled Jabari Cooper, the same man whose fingerprint was

found on a confirmed WSB package seized in June 2021. [*Id*. at pp. 12-13]. The other male was recognized by a Postal Inspector reviewing the footage as Eric Bechet. [*Id*. at p. 12]. Agents further connected Kinloch to Bechet and Cooper through a review of Kinloch's toll records which revealed that a phone number registered to Bechet was the last phone call Kinloch made before dropping off the parcels at the Chamblee Post Office. [*Id*. at p. 13].

A month later, the APD began investigating Ms. Lenoir's disappearance after she was reported missing after a night hanging out with Defendant and Reynolds. *See* pp. 4–11 *supra*. Within two weeks of opening the investigation, the APD determined Ms. Lenoir likely died from an overdose and continued to investigate Defendant and Mr. Reynolds for felony murder based on their providing drugs to Ms. Lenoir on the evening she was last seen with them. *See* pp. 10–11 *supra*. As the APD's investigation developed, WSB appeared to change their operational procedures to further allude law enforcement. [*Id*. at p. 14].

Meanwhile, back over at the FBI, agents continued their investigation through a confidential human source (CHS). [*Id*.]. In January 2024, agents tasked the CHS with assistance in identifying WSB through controlled buys. [*Id*.]. The CHS made his first contact with WSB on January 10, 2024, arranging for a bulk narcotics deal for fentanyl and methamphetamine outside of the darknet marketplace. [*Id*. at pp. 14-15]. The admin who spoke with the CHS used the identifier "wallstreetbet_support." [*Id*. at p. 15].

During the exchange, wallstreetbet_support informed the CHS that his "blues aren't perfect they are thick. Not pharma passible but smacks." [*Id*.]. The next day, the CHS used the FBI's funds to fulfill the purchase. [*Id*.]. The FBI funds were converted into Bitcoin ("BTC") before being transferred from BTC into Monero ("XMR"), the only form of cryptocurrency accepted by WSB.[20] The CHS maintained consistent contact with wallstreetbets_support until the order arrived in late January 2024, at which point agents collected the parcel. [*Id*.]. Nevertheless, agents were unable to identify where the parcel was dropped off other than somewhere in the Atlanta metro area. [*Id*.].

At some point in February 2024, during one of the CHS's several controlled buys, the CHS obtained the Proton email address, welcometotheblackparade1993@proton.me, associated with WSB through Bitcoin Postage.[21] [*Id*. at p. 22]. After requesting the records associated with the address from ProtonMail, agents received a Bitcoin receiving address, which the account holder, WSB, sent to Proton Mail to pay for a service. [*Id*. at p. 23]. Agents traced the payment back to a wallet address attributed to

---

[20] "Monero," or "XMR" is a "private, decentralized cryptocurrency that keeps your finances confidential and secure." [Doc. 18-1, p. 49]. Further, "Monero can be used to obfuscate the origins and destinations of cryptocurrency transactions by exchanging on cryptocurrency for Monero, where cryptocurrency transactions cannot be readily observed, and then exchanging from Monero back into another cryptocurrency, such as bitcoin." [*Id.*].

[21] According to the government, "Proton Mail is a Swiss based company that operates in Geneva, Switzerland." [*Id*. at p. 22].

StealtEx.io, SimpleSwam, Guardian, and ChangeNow.[22] [*Id.*]. Agents concluded that the most likely entity was ChangeNow because it supported XMR (Monero) and WSB only accepted payments in XMR. [*Id.* at p. 23]. Agents followed this lead by requesting records from ChangeNow regarding the BTC wallet address ending in the last six digits of the WSB transaction address hoping ChangeNow would provide an IP address for the transaction. [*Id.*]. Indeed, it did. ChangeNow provided an IP address belonging to Verizon Wireless which resulted in association with an additional two BTC addresses. [*Id.*]. Agents analyzed the records and found one of the addresses to be geolocated in both Atlanta and Wichita, Kansas. [*Id.* at p. 24]. It was also revealed that the address received direct funding from CashApp. [*Id.*]. The other address was geolocated in the Atlanta area, Chicago area, and Wichita area and was associated with two additional IP addresses– one for Blue Ridge Mountain EMC Georgia and one for Verizon Wireless. [*Id.*]. The two providers then confirmed that the IP addresses were geolocated in Atlanta, Georgia. [*Id.*].

WSB subsequently agreed to another controlled buy with the CHS for a bulk order of fentanyl pills but never sent the order. [*Id.* at 16]. WSB repeatedly assured the CHS that the delivery would be fulfilled and that it valued his business, explaining that

---

[22] StealthEX, SimpleSwap, Guardarian, and ChangeNOW are online services that allow users to exchange one cryptocurrency for another. *See Frequently Asked Questions*, StealthEX, https://stealthex.io/faq/ (last visited Aug. 25, 2026); *About Us*, SimpleSwap, https://simpleswap.io/about (last visited Aug. 25, 2026); *Guardarian*, https://guardarian.com/ (last visited Aug. 25, 2026); *Frequently Asked Questions*, ChangeNOW, https://changenow.io/faq (last visited Aug. 25, 2026).

a slowdown in Palmetto, Georgia was impacting many of his shipments. [*Id*.]. As an appeal to the CHS's grace, WSB touchingly explained, "I gave my life to this market. The only thing I do besides be on market is teach my kids and even now I have been neglecting them." [*Id.*].

Despite the delay, the FBI did not remain idle, pursuing other leads including a new identification of a potential co-conspirator: our Defendant. On May 28, 2024, Agents identified Wells Fargo financial records associated with Bechet and Defendant that showed the two men sending and receiving several wire transfers between each other from August to November of 2020, totaling $19,726. [*Id*. at p. 17]. The records also showed Serina Johnson, Defendant's significant other and mother of his children, receiving numerous wire transfers around the same time that amounted to $22,230. [*Id*.]. Agents also requested Robinhood financial records and identified Bechet indirectly receiving money from ASAP marketplace through an unknown intermediary. [*Id*.]. Moreover, a closer look into Defendant through open-source checks revealed that he was, at the time, a fugitive from the APD for his involvement in an alleged overdose death. [*Id*.]. Much like they had with the three prior overdoses linked to WSB suspected conspirators, including the death of Samuel Bergsagel, the FBI followed this lead. [*Id.*].

In the meantime, the CHS continued to wait for his prior fentanyl order to be shipped. [*Id.* at pp. 16-17]. The CHS stayed in constant communication with WSB until May 30, 2024, when WSB went offline, resulting in his items being pulled from the

marketplace due to inactivity. [*Id.*].

On June 1, 2024, Defendant and Bechet were enjoying the summer day jet-skiing on Lake Altoona when Corporal Tyler Lewis with the Georgia Department of Natural Resources ("DNR") observed Defendant doing donuts on his jet-ski in the no-wake zone, a violation of state law, and stopped him to issue a warning. [Doc. 232, p. 53]. Cpl. Lewis pulled his patrol boat next to Defendant's jet-ski and began explaining the reason for the stop before asking for identification so that he could issue a warning. [Doc. 222 Ex No. 1, 01:34]. When Defendant informed Cpl. Lewis that he did not have any form of ID with him, Cpl. Lewis asked Defendant for his name. [*Id*. at 01:15]. Unfortunately, this marked the end of Defendant's pleasantries.

For the next 18 minutes, Defendant became increasingly confrontational, refusing to comply with any requests and insisting that Cpl. Lewis just let him go. *See generally* [*Id*.]. Defendant eventually provided the name "Stan Barclay" and a date of birth of April 25th, 1995, which was evidently a fake name. [*Id*. at 05:00]; [Doc. 232, p. 54]. Bechet, who throughout this entire exchange was coasting feet away on his own jet-ski, chimed in to offer his own fake name for Defendant. [Doc. 222, Ex No. 1, 18:00]. At this point, Cpl. Lewis concluded the stop was going nowhere and instructed Defendant to get into his boat because he was under arrest. [*Id*. at 18:45]. Instead, Defendant threw himself backwards off the jet-ski and into the water. [*Id*. at 19:15]. Defendant initially climbed back onto the jet-ski where Cpl. Lewis was able to grab him by the arm to

secure him, however he then returned to the water, took his life jacket off, and submerged for some time before resurfacing, climbing back onto the jet-ski, and taking off. [*Id*. at 19:45]; [Doc. 222, Ex No. 2, 00:30]. A chase ensued down Lake Altoona. [Doc. 222, Ex No. 2, 03:40].

Defendant coasted his jet-ski near a shore before fleeing into the woods on foot, followed closely by Cpl. Lewis who eventually caught and apprehended him. [*Id*. at 04:40]. Although Defendant was visibly disoriented and struggling to stand up, Cpl. Lewis handcuffed him and assisted him back into the patrol boat. [*Id*. at 06:30]. Cpl. Lewis then took Defendant back to the boat ramp where law enforcement from the Emerson Police Department was waiting with a scanner to fingerprint him. [Doc. 232, p. 58]. Once fingerprinted, Cpl. Lewis learned he had arrested Steven Oboite, a fugitive that the APD wanted for murder. [*Id.*]. Defendant was arrested on the murder warrant and taken to the Bartow County jail to await extradition to Fulton County. [*Id.*].

After Defendant was taken away, Cpl. Lewis and his partner returned to the jet-ski, where his supervisor had stayed behind, and conducted a search incident to arrest. [Doc. 222, Ex No. 4, 00:05]. Cpl. Lewis found a black iPhone in the jet-ski that he determined belonged to Defendant and removed it to return to Defendant's property at the jail. [Doc. 232, p. 59]; [Doc. 236-12, p. 5]. He then ran the registration and found Bechet owned the jet-ski. [Doc. 232, p. 59]; [Doc. 236-12, p. 5].

A day later, FBI agents learned that the DNR had arrested Defendant. [Doc. 18-1,

p. 17]. WSB continued to be offline throughout this time until two weeks later when it reengaged contact with the CHS and explained, "[o]ur lead was in a terrible accident and we are just now getting back rolling after the unexpected hit." [*Id.* at p. 18]. The nature of the message led the FBI to believe someone else was also moderating the conversation. [*Id.*]. In addition to his private communication with the CHS, WSB posted a public apology for the disappearance with subject line "Wall Street Bets is Back." [*Id.*].

After learning of the APD's ongoing investigation regarding Defendant's involvement with Ms. Lenoir's overdose in 2022, agents went back to Defendant's financial records. Given the link between the prior overdose in Athens, Georgia which was ultimately traced to WSB, the recent observations of Defendant's financial records, and the all too coincidental WSB disappearance when Defendant was arrested, Agent McCusker, who had joined the FBI's investigation just months prior, reached out to Det. Leonpacher with the APD to figure out if the two ongoing investigations were really two sides of the same coin. [Doc. 236-2, p. 1]. Agent McCusker informed Det. Leonpacher that he was investigating Defendant under the online pseudonym "wallstreetbets," which was potentially directly linked to Defendant's involvement with controlled substances. [Doc. 237, p. 17]. Det. Leonpacher indeed confirmed that the identifier was present in Defendant's phone extraction obtained in 2022 pursuant to a search warrant for Defendant's iPhone SE. [*Id.* at pp. 17–18]. Specifically, a keyword search for the identifier search revealed an image of a what looked like "a guy with --

with Tom Cruise sunglasses on and little whippy hair." [*Id.* at p. 112]. Moreover, the image showed a date of August 3, 2022, at 7:19 PM, placing it squarely in the time of interest for the APD's murder investigation. [Doc. 236-2, p. 1]. Agent McCusker then confirmed to Det. Leonpacher that was the correct image tied to the online narcotics trafficking vendor WSB. [Doc. 237, p. 11].

Finding that the FBI and APD cases were in fact highly related, Agent McCusker requested the iPhone SE and iPhone 13 ProMax extractions Det. Leonpacher had created in 2022. [Doc. 236-5, p. 1]. After a failed attempt at sharing the link, Det. Leonpacher moved the files to a hard drive so he could share them with Agent McCusker. [Doc. 236-8, p. 1]. Agent McCusker also received the search warrants for both phones from Det. Demeester. [Doc. 236-14]. On August 6, 2024, Det. Demeester sent Defendant's Google records from 2022 that he had obtained pursuant to the 2022 Google warrant. [Doc. 236-10, p. 1]. A couple weeks later, Agent McCusker picked up a copy of the iCloud records from Det. Demeester at his office. [Doc. 236-8, p. 3].

On August 29, 2024, FBI agents requested information from CoinBase for accounts associated with Bechet and Defendant based on the IP addresses analyzed in the months prior that revealed suspicious transactions using CoinBase from the WSB email address the CHS had obtained. [Doc. 18-1, p. 24]. The records showed that Defendant had registered with Coinbase using the email address steveoboite@gmail.com and phone number 404-772-7128. [*Id.*]. The records also

revealed transactions that totaled approximately $1,143,582.84. [*Id.*]. Agents subsequently obtained responsive data from Apple that confirmed Defendant's Apple ID account email and phone number as the same email address and phone number registered with CoinBase. [*Id.* at p. 30]. The records from Apple further revealed that Defendant owned an Apple iPhone, which was later identified as the phone found by DNR in the jet-ski and placed in Defendant's property at the Fulton County Jail. [*Id.*].

Based on this information, Agent McCusker sought two Federal Warrants: one for Defendant's iCloud records ("Federal iCloud Warrant") and one for Defendant's Google records ("Federal Google Warrant"). [Doc. 18]; [Doc 22]. Both were issued by Judge Weigle in the United States Middle District of Georgia in November 2024. [Doc. 18]; [Doc. 22]. As a result of the Federal Google and Apple Warrant returns, Agent McCusker sought and obtained a final warrant for the search and seizure of Defendant's third iPhone– the DNR phone ("DNR Phone Search Warrant") in March of 2025. [Doc. 179, DNR Phone Federal Warrant].

## DISCUSSION

### A. SEARCH AND SEIZURE OF DEFENDANT'S DNR PHONE

Defendant challenges the FBI's DNR Phone Search Warrant on two grounds. First, Defendant argues the phone was seized without a warrant and not subject to any of the Fourth Amendment's exceptions to the warrant requirement, so that the evidence seized from the unlawful seizure must be suppressed. [Doc. 167, p. 1]. Second,

Defendant argues that "any information obtained through the use of the [DNR Phone Warrant] in this case should be suppressed because officers waited too long to secure a warrant," thereby making the search unreasonable. [*Id.* at p. 2]; [Doc. 168, pp. 3-5]. In response, the government argues that Defendant lacks standing because he abandoned the cell phone when he jumped off the jet-ski and fled into the woods, and that even if he had standing, the search falls under several warrant exceptions including the inventory-search and search-incident-to-arrest exceptions. [Doc. 191, pp. 2–3]; [Doc. 232, pp. 83-84]. Since the Court finds that the search-incident-to-arrest exception provides ample support for the warrantless seizure of the DNR phone, it declines to address the government's abandonment theory and rejects Defendant's argument that the DNR impermissibly seized his phone without a warrant.[23]

**1. <u>Warrantless Seizure of Defendant's Phone</u>**

Absent consent, police officers generally must obtain a warrant supported by probable cause to justify a search under the Fourth Amendment. *United States v. Magluta,* 418 F.3d 1166, 1182 (11th Cir. 2005). There are, however, several established exceptions to the warrant requirement. *United States v. Alston*, 598 F. App'x 730, 733 (11th Cir. 2015). One, in particular, allows a search of a vehicle incident to a lawful arrest of a recent occupant ("search incident to arrest exception"). *See Arizona v. Gant*,

---

[23] The Court orally denied Defendant's motion to suppress as to the seizure of the phone at Lake Altoona, but it nonetheless addresses the issue here to more fully elaborate on its reasoning.

556 U.S. 332, 343–44 (2009). According to the Supreme Court, two situations permit officers to search a vehicle incident to arrest: (1) "when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search" or (2) "when it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." *Alston*, 598 F. App'x at 733 (quoting *Gant*, 556 U.S. at 343) (per curiam). Moreover, "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." *New York v. Belton*, 453 U.S. 454, 460 (1981).

Here, Cpl. Lewis arrested Defendant for various violations of state law stemming from his hot pursuit of Defendant down Lake Altoona after he fled on the jet-ski before reaching shore and fleeing on foot. [Doc. 222, Ex No. 2, 04:40]. Defendant argues that the search-incident-to-arrest exception does not apply because "under *Gantt v. Arizona* [sic], it has to be in the Defendant's grab area" and "the testimony was this [jet-ski] was nowhere near Defendant." [Doc. 232, p. 84]. Defendant misreads *Gantt,* which clearly holds that "[p]olice may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search *or* it is reasonable to believe the vehicle contains evidence of the offense of arrest." 556 U.S. at 351. (emphasis added).

First, Cpl. Lewis testified that during his initial contact with Defendant, he suspected Defendant to be impaired based on "[t]he odor of consumed alcoholic

beverage coming from his person, a thick white substance at the corner of his mouth that grew as he spoke. He spoke with a slurred speech, thick speech, and confused." [Doc. 232, pp. 54–55]. Indeed, the DNR cited Defendant for operating a watercraft under the influence of alcohol, drugs, or toxic vapor pursuant to O.C.G.A. § 52-7-12(a). [Doc. 236-12, p. 3]. This arrest allowed Cpl. Lewis to search the jet-ski since suspicion of driving while intoxicated through the well-established destruction of evidence exigency exception. *See United States v. Smith*, 322 F. App'x 876, 878 (11th Cir. 2009) (per curiam) (finding that the Fourth Amendment permitted law enforcement to search the vehicle incident to preserve evidence where the officer who approached the defendant "noticed that he was agitated and smelled strongly of alcohol" and ultimately placed him under arrest for driving under the influence); *see also United States v. Pinder*, No. 1:08-CR-421-03-MHS-AJB, 2009 WL 10670633, at *24 (N.D. Ga. Dec. 23, 2009) *report and recommendation adopted*, No. 1:08-CR-421-03-MHS, 2010 WL 11507903 (N.D. Ga. Mar. 5, 2010), *aff'd*, 437 F. App'x 816 (11th Cir. 2011) ("when a party is arrested for a drug crime, there is an evidentiary basis for the search of that party's vehicle because a drug offense is an offense for which police could . . . expect to find evidence in the car." (citing *Gantt*, 556 U.S. at 343–44)). At that point, Cpl. Lewis already had the right to search the jet-ski for evidence related to why he arrested Defendant: operating a jet-ski while intoxicated. Specifically, Cpl. Lewis rightfully searched the jet-ski's compartment to see if there was any evidence related to the arrest such as beer or liquor bottles or controlled substances.

Nevertheless, by the time DNR searched the jet-ski, law enforcement had fingerprinted Defendant, learned that he was wanted for murder, and arrested him on that arrest warrant as well as the other charges outlined above. [Doc. 232, p. 61]; [Doc. 236-12, p. 5]. Accordingly, this would also have permissibly informed the scope of Cpl. Lewis's search and seizure. That is, Cpl. Lewis would have been allowed to search the any jet-ski compartment that might have contained evidence of any of the enumerated crimes, including murder, and he was permitted to seize any items which he believed to contain evidence of the same, including Defendant's phone.

Still, Defendant argues that since DNR was not involved with the APD's murder investigation, they did not know the evidence nor the nature of the case beyond that it was for murder, therefore it could not have been reasonable to believe that the phone specifically would contain evidence of the crime to permit its seizure. [Doc. 232, p. 86]. Defendant conflates the rules governing warrantless searches and warrantless seizures. *See United States v. Odoni*, 782 F.3d 1226, 1237 (11th Cir. 2015). Perhaps DNR would have needed more particularized suspicion had one of its officers actually searched the phone incident to arrest. *See id*. at 1237–38 ("the fact that police have lawfully come into possession of an item does not necessarily mean they are entitled to search that item without a warrant). However, Cpl. Lewis was abundantly justified in seizing the phone based on his reasonable suspicion that the jet-ski may contain evidence of any one of Defendant's numerous crimes, including not only the crimes committed on the

water, but for the murder as well. *See Riley v. California*, 573 U.S. 373, 388 (2014) (stating that although a warrant is required before officers may *search* the digital contents of a phone seized incident to arrest, officers may *seize* and secure cell phones to prevent destruction of evidence while seeking a warrant); *United States v. Simeon*, 752 F. App'x 822, 824 (11th Cir. 2018) (finding that where law enforcement discovered an active warrant for Defendant's arrest after conducting an unrelated traffic stop, the officer "was not required to release the car . . . if he reasonably suspected that something in the car was linked to further criminal activity.").

Here, Cpl. Lewis had just executed the APD's arrest warrant for Defendant's alleged involvement in a murder so it was entirely reasonable for him to believe that Defendant's phone may contain evidence related to that arrest. To accept Defendant's argument would effectively render moot *Gantt's* second prong as well as the exigency exception any time a law enforcement officer arrested someone pursuant to an active warrant as it would require the arresting officer to have some familiarity with the intricacies of the investigation that lead to the active arrest warrant. *See United States v. Correa*, 347 F. App'x 541, 545 (11th Cir. 2009) (reasonable for agents to conclude that a cellular phone contained digital evidence about a drug conspiracy because cellular phones are "known tool[s] of the drug trade"). The Constitution doesn't impose any such burden. Therefore, given the probable cause for Defendant's arrest,[24] Cpl. Lewis

---

[24] Defendant does not contest this.

was permitted to search the jet-ski incident to arrest. He was further permitted to seize the phone because it was reasonable to believe it may contain evidence of one of the crimes committed. *See e.g.*, *United States v. Graham*, 123 F.4th 1197, 1240 (11th Cir. 2024) (collecting cases).

**2. <u>Unreasonable Search</u>**

"[T]he ultimate touchstone of the Fourth Amendment is reasonableness." *Riley*, 573 U.S. at 381. Therefore, "even a seizure based on probable cause is unconstitutional if the police act with unreasonable delay in securing a warrant." *United States v. Mitchell*, 565 F.3d 1347, 1350 (11th Cir. 2009) (citation omitted). "[T]he reasonableness determination will reflect a careful balancing of governmental and private interests." *Id.* at 1351 (citation omitted).

In two of his ten motions, Defendant argues that "any information obtained through the use of the [DNR Phone Search Warrant] in this case should be suppressed because officers waited too long to secure a warrant." [Doc. 167, p. 2]; [Doc. 168, p. 3]. According to Defendant, the DNR arrest report states that his cell phone "was seized" and held "until contact was made with Atlanta PD homicide." [Doc. 167, p. 3]; [Doc. 168, pp. 4-5]. "[T]hree days later…the phone was placed in [Defendant's] property at the *Bartow County* jail." [Doc. 167, p. 3]; [Doc. 168, pp. 4-5]. Nine-months later, "federal agents secured a warrant for the phone, allegedly removed it from [Defendant's] property in *Fulton County*, and downloaded its contents." [Doc. 167, p. 3]; [Doc. 168, pp.

4-5]. Defendant argues that this nine-month delay between the phone's seizure by the DNR/APD and the FBI's obtaining a warrant was unreasonable and therefore violated the Fourth Amendment. [Doc. 167, p. 3]; [Doc. 168, pp. 4-5].

As explained above, the DNR legally seized Defendant's phone. *See* p. 55 *supra*. Both Cpl. Lewis's testimony and his incident report show that he temporarily seized Defendant's phone while tried to get in touch with the APD homicide unit. [Doc. 232, p. 59]; [Doc. 236-12, p. 7]. After talking with Det. Demeester, the lead investigator on Ms. Lenoir's case, Cpl. Lewis was advised to put the phone back in Defendant's property in the Bartow County Jail and that the APD fugitive recovery would pick up Defendant's property when it came to extradite him to the Fulton County Jail.[25] [Doc. 236-12, p. 7]. Cpl. Lewis did just that.[26] [*Id.*]. Defendant attempts to frame the facts as a continuous nine-month warrantless seizure of Defendant's phone *by the FBI* while the government waited to establish probable cause, but this could not be farther from the case.

[25] The Court specifically asked Cpl. Lewis why he called Det. Demeester and how he knew about the murder. Cpl. Lewis testified that the fingerprint done at the boat ramp with "[t]he Rapid ID scanner…came back with the warrant for homicide out of Fulton County." [Doc. 232, p. 60]. He further elaborated, "[i]n my experience working my investigations, it just kind of occurred to me that, like, maybe an investigator might want this thing and might want to use it for their thing that they had going on, once I realized what he was wanted for." [*Id.*]. Having observed Cpl. Lewis' testimony, demeanor, body language, mannerisms, and delivery, the Court found him to be a credible witness. *Molina-Rivera v. U.S. Att'y Gen.*, 723 F. App'x 913, 914 (11th Cir. 2018). His testimony, in addition to the Court's independent review of the body camera footage, sufficiently extinguished any of Defendant's theories of an interjurisdictional conspiracy against him.

[26] Cpl. Lewis testified that in the interim, he did not turn on the phone or otherwise tamper with it, and the Court specifically found Cpl. Lewis's testimony to be credible. [Doc. 232, p. 80].

Nothing in the record details what happened to Defendant's phone, if anything, once it went to the Fulton County Jail, but what is clear is that the FBI had nothing to do with the phone during this time. [Doc. 232, pp. 59–61]. The DNR legally seized the phone, gave it to the Bartow County Sheriff's department which then transferred it to the Fulton County Sheriff's Department with the Defendant's other property. [*Id*. at 59–60]. As far as the Court can tell, the DNR phone sat in the Fulton County Jail, technically in government custody, for nine months for no reason other than that Defendant was also sitting in the Fulton County Jail in government custody.

Because the DNR legally seized the phone, the Defendant had long lost any possessory interest in the phone that could be improperly or illegally infringed during this time. *See e.g.*, *United States v. Robinson*, 414 U.S. 218 n.1 (1973) (Powell, J., concurring) ('To say that the police may curtail the liberty of the accused but refrain from impinging upon the sanctity of his pockets except for enumerated reasons is to ignore the custodial duties which devolve upon arresting authorities. Custody must of necessity be asserted initially over whatever the arrested party has in his possession at the time of apprehension. Once the body of the accused is validly subjected to the physical dominion of the law, inspections of his person, regardless of purpose, cannot be deemed unlawful, unless they violate the dictates of reason either because or their number of their manner of perpetration.") Indeed, the Defendant never makes it entirely clear what he would have had law enforcement do with his phone other than

place it with his property at the jail he was being held.

The FBI never seized the phone at any point before executing its own warrant in 2025. [Doc. 179, DNR Phone Federal Warrant, p. 16]. Nor is there evidence that the FBI told the DNR to seize it on the FBI's behalf. In fact, the DNR clearly had no idea of the FBI's investigation. The fact remains that the phone wasn't going to be released to anyone other than the Defendant and then not until and if he was released from the Fulton County jail. And, since Fulton County was holding Defendant without bond on the murder charge, he clearly wasn't going to be released in the near future.

Because the FBI neither seized the phone nor possessed it while it was at the Fulton County jail, the Court finds no Fourth Amendment violation based on the nine months from when the DNR took the phone and the FBI ultimately searched it.

Having resolved each issue raised by Defendant in his motion, the Court **DENIES** Defendant's Motion to Suppress Evidence Illegally Seized After Mr. Oboite's 2024 Arrest. [Doc. 167].

### B. APD'S EXECUTION OF THE SEARCH WARRANTS[27]

The Fourth Amendment governs the execution of the warrant by requiring that officers conduct their search "strictly within the bounds set by the warrant." *See Bivens*

[27] In the first part of this order, the Court addressed Defendant's motions challenging the validity of the APD's six warrants. Having found each warrant obtained by the APD to be valid, the Court now returns to the APD's conduct one final time to resolve the only remaining issue: whether the APD reasonably executed the search warrants. [Doc. 161, pp. 16–17]; [Doc. 162, pp. 13–14]; [Doc. 163, pp. 14–16]; [Doc. 164, pp. 7–9]; [Doc. 165, pp. 7–9]; [Doc. 169, pp. 11–13].

*v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 395 n.7 (1971). "Determining whether a search exceeds the scope of its authorizing warrant is, like most inquiries under the Fourth Amendment, an exercise in reasonableness assessed on a case-by-case basis." *See United States v. Loera*, 923 F.3d 907, 916 (10th Cir. 2019) (citing *Dalia v. United States*, 441 U.S. 238, 258 (1979)). Recognizing the unique challenges in enforcing the limitations of a warrant to search digital medias, courts have increasingly turned their focus to *how* the computer search was conducted rather than *what* was searched. *See id*. at 916–17; *see also United States v. Khanani*, 502 F.3d 1281, 1290 (11th Cir. 2007) (finding a computer search to have been reasonable based on the procedural and administrative method deployed by law enforcement in identifying data relevant to the warrant). "Shifting our focus in this way is necessary in the electronic search context because search warrants typically contain few—if any—restrictions on where *within a computer* or other electronic storage device the government is permitted to search." *See Loera*, 923 F.3d at 917 (emphasis in original). The reasonableness of the search method depends on the particular facts of a given case. *See United States v. Schandl*, 947 F.2d 462, 465 (11th Cir. 1991) ("The crucial inquiry is always whether the search and seizures were reasonable under all the circumstances.") (citation omitted); *New Jersey v. T.L.O.*, 469 U.S. 325, 337 (1985) ("what is reasonable depends on the context within which a search takes place.") In general, investigators executing a warrant can look anywhere where evidence described in the warrant might conceivably be located. *See*

*United States v. Ross*, 456 U.S. 798, 824 (1982). "Officers executing a warrant may search as extensively as reasonably necessary to locate the items described in the warrant." *United States v. Patel*, 429 F. App'x 885, 888 (11th Cir. 2011); *see also United States v. Ochoa*, 402 F. App'x 478, 484–85 (11th Cir. 2010).

The party moving to suppress bears the initial burden of persuading the court, through specific factual allegations and supporting evidence, that the evidence should be suppressed. *de la Fuente*, 548 F.2d at 533-34; *Freire*, 710 F.2d at 1519. Moreover, "[a]bsent a flagrant disregard of the terms of the warrant, the seizure of items outside the scope of a warrant will not affect admissibility of items properly seized." *United States v. Hill,* No. CR 114–028, 2014 WL 5410214, at *8 (S.D. Ga. Oct.23, 2014) (quoting *Khanani,* 502 F.3d at 1289). "Nor does the use of officer discretion in reviewing items before deciding whether to seize them amount to flagrant disregard of the terms of the warrant," since "[t]he practical realities of a search permit a brief perusal of items to determine what is authorized by a warrant." *Id*. (citing *United States v. Miranda*, 325 F. App'x 858, 860 (11th Cir. 2009) (per curiam) (unpublished)). Indeed, "[t]he extreme remedy of blanket suppression should only be imposed in the most 'extraordinary' of cases." *United States v. Brooks*, No. 3:13-CR-58-J-34JRK, 2014 WL 292194, at *15 (M.D. Fla. Jan. 27, 2014), *aff'd*, 648 F. App'x 791 (11th Cir. 2016) (quoting *United States v. Foster*, 100 F.3d 846, 852 (10th Cir. 1996)).

### 1. iPhone SE and iPhone 13 ProMax Searches (2022)

First, Defendant argues that the APD's searches of his iPhone SE and iPhone 13 ProMax violated the Constitution because, despite the warrant including a time-based limit, the APD nonetheless downloaded a complete extraction of each phone, including data outside the time limits, meaning the APD exceeded the scope of the warrant. [Doc. 169, pp. 11–13]. Specifically, Defendant complains that the APD did not implement any parameters to limit the extraction to only data falling within the period authorized in the warrant. [Doc. 237, p. 69]. Defendant points to three exhibits he especially finds problematic: (1) the search warrant which set a scope of data from July 20, 2022, through August 24, 2022 and (2) one extraction report for each phone stating, "[t]he search warrant gave authorization for a complete search of the aforementioned devices as a result of an Aggravated Assault investigation." [Doc. 213, p. 3]; [Doc. 236-1, p. 3]; [Doc. 236-7, p. 3].

Contrary to Defendant's argument, the text of the Fourth Amendment does not impose a rigid analysis protocol for searching digital extractions and the Eleventh Circuit also declined to read such a requirement into the text. *Khanani*, 502 F.3d at 1290. During the evidentiary hearing, Det. Leonpacher, one of the investigators responsible for the digital forensics of the phones, provided a robust explanation of the technical process, including the fact that while it is technically possible to limit the data during the second-stage decoding process using a software called "XRY," his training and

experience shows this isn't routinely done because the metadata of a particular digital file may not accurately reflect the date and time. [Doc. 237, pp. 13, 23–24]. For example, Det. Leonpacher explained,

> [i]f an image is deleted, then it may carry that date of deletion even though the image was from the period of time that is a part of our scope. So, and I say that just because I've got a lot of experience with digital forensics and that matters to me to say that I'm not looking necessarily outside the scope but for something that may be within the scope that may have different metadata that if we set parameters on the front of a forensics side, that could limit our ability to discover this evidence that's directly related and within the scope.

[*Id*. at p. 24].[28] Det. Leonpacher further testified that this is standard practice and that he instead "would rely more on the review side, the analysis side" to identify what is responsive to the warrant. [*Id*. at p. 22].

The Eleventh Circuit has upheld forensic search processes like this one where law enforcement agencies extract the full contents of a device and then manually identify responsive materials. *Khanani*, 502 F.3d at 1285; *see also Travers*, 233 F.3d at 1331. Therefore, the Court finds that the APD's extraction of the complete contents of Defendant's phone is not per se unreasonable and the government has met its burden of

[28] Having observed Det. Leonpacher's testimony, demeanor, body language, mannerisms, and delivery, the Court found him to be a credible witness. *Molina-Rivera*, 723 F. App'x at 914. This would suffice to end the inquiry here. *See United States v. Williamson*, No. 24-12038, 2026 WL 1876371, at *7–8 (11th Cir. June 30, 2026). Nevertheless, the Court does note that extensive research of similar cases reinforces this technical feature as informing the forensic analysis process of numerous law enforcement agencies in this circuit and beyond. *See e.g.*, *United States v. Palms*, 21 F.4th 689, 700 (10th Cir. 2021) (where the officer testified that he could not perform a more limited extraction of the cell phone, "so he conducted a broad physical extraction of the entire contents and metadata" and that he believed other agencies had the same extraction options as he had).

proving by a preponderance of the evidence that the APD's search method of extracting the entirety of Defendant's phones and manually culling through the evidence to identify responsive data to be was reasonable so that it did not violate the Fourth Amendment.

### 2. <u>APD's Review of iPhone SE Extraction (2024)</u>

Defendant next argues that the APD illegally expanded the scope of the warrant when Det. Leonpacher returned to the extraction in 2024 and did a keyword search for "wallstreetbets" because (1) "they didn't execute their search within that ten days" and (2) "[t]hey weren't looking for evidence related to the crimes that are outlined in the warrant." [Doc. 232, p. 14]. During the evidentiary hearing, the government did not respond to the first argument but did argue that the keyword search was for evidence directly related to the APD's case, therefore challenging Defendant's framing of the two investigations. [*Id*. at pp. 26–29].

The Court quickly addresses Defendant's first argument that Det. Leonpacher violated the Fourth Amendment because he did not and could not conduct his 2024 within ten days from the issuance of the warrant in 2022. The relevant law quickly dispatches this argument.

O.C.G.A. § 17–5–25 provides in pertinent part that a "search warrant shall be executed within ten days from the time of issuance. . . . Any search warrant not executed within ten days from the time of issuance shall be void and shall be returned

to the court of the judicial officer issuing the same as 'not executed.'" O.C.G.A. § 17–5–25. However, the warrant for the search of Defendant's phones was considered to have been executed for the purpose of satisfying O.C.G.A. §17–5–25 once the APD extracted the phone data and its later return to the extraction did not in and of itself create a new Fourth Amendment event.[29] *Mastrogiovanni v. State*, 751 S.E.2d 536, 539–40 (Ga. App. 2013). So long as the APD's later review stayed within the bounds of the original warrant that permitted the initial 2022 extraction, its later review was a continuation of the search, not a wholly new search requiring a second warrant. *Id*. Accordingly, the Court turns to Defendant's next argument to decide whether Det. Leonpacher's keyword search was within the bounds of the warrant– an issue pervasive throughout the remainder of this order.

Defendant consistently attempts to frame the state case as a murder case to pit its evidentiary scope at odds with the FBI's narcotics trafficking investigation, yet he offers nothing about the fact that Georgia charged him with felony murder for his alleged

[29] The warrant itself specified that it must be executed within ten days of issuance. Federal Rule of Criminal Procedure 41(e)(2)(A)(i) likewise requires that a warrant command the officer to execute it within a specified time no longer than 14 days. Because both the warrant's own terms and Rule 41 impose substantially identical timeliness requirements, the Court's analysis of whether the warrant was timely executed applies with equal force regardless of whether the obligation is framed under O.C.G.A. § 17–5–25 or Rule 41.

involvement with Ms. Lenoir's drug overdose.[30] [Doc. 237, pp. 89-90]. Det. Leonpacher testified that during a phone call with Agent McCusker, he was provided an identifier of "wallstreetbets" attributed to Defendant's alleged business in online trafficking of narcotics. [*Id*. at p. 17]. He then returned to the iPhone SE extraction from 2022 and conducted a search "for anything that may correlate to that identifier, which is associated with narcotics trafficking or distribution, which is directly related to the accusations against [Defendant] in the State case." [*Id*.]. A review of the records also shows that the image reflects a date of August 3, 2022, falling comfortably within the time-based scope of the warrant.[31] [Doc. 236-2, p. 10]. When asked on direct whether it was fair to say that evidence of drugs would be responsive to his investigation and warrant, Det. Demeester reinforced this, stating "[v]ery much so; yes." [Doc. 237, p. 90].

Moreover, an independent review of the evidence and testimony compels the Court to agree with the government that the two investigations are not nearly as distinct as Defendant would argue. Rather, Defendant's possession and/or distribution of narcotics is, and always has been, the linchpin of the state case. The investigation began with searching Defendant's AT&T records for possession of a controlled

---

[30] The Court reached this conclusion based not only on Det. Demeester's testimony, but on a chronological review of the exhibits submitted, including each warrant, which clearly show that from the moment Ms. Green spoke with the APD, drugs remained the linchpin of the APD's case. True, the case progressed from drug possession to felony murder based on drug overdose, but the drugs themselves remained the centerpiece of the investigation.

[31] This was not a decisive factor given prior testimony about the date being unreliable information, however it was probative considering separate corroborating evidence.

substance. [Doc. 236-18]. After reviewing the Defendant's records and finding that throughout the night numerous calls were made to emergency rooms, pharmacies, and drug rehabilitation facilities, and after a search warrant executed at the residence revealed the presence of blood, Det. Demeester and Det. Leonpacher began to investigate Defendant for his role in Ms. Lenoir's potential overdose and disappearance. [Doc. 236-20, pp. 2–3]. Every warrant from that point forward states as much. [*Id*.]; [Doc. 236-24, pp. 3–4]; [Doc. 236-17, p. 6]; [Doc. 236-11, p. 6]; [Doc. 236-19, p. 6].

The record unequivocally demonstrates that the state case doesn't in any way allege that Defendant maliciously murdered Ms. Lenoir by shooting her, stabbing her or strangling her and it just so happened that drugs were around that night. Indeed, such a case would align more closely with the case law Defendant cites and raise genuine concerns about the FBI rummaging around for evidence of any unrelated crime without a warrant. *Compare United States v. Hulscher*, No. 4:16–CR–40070–01–KES, 2017 WL 657436, at *3 (D.S.D. Feb. 17, 2017) (rejecting government argument that, in essence, law enforcement agencies can permanently save all unresponsive data collected from a cell phone after a search for future prosecutions on unrelated charges where Defendant's phone was initially searched pursuant to a warrant for forgery, counterfeiting, and identity theft charges and then shared later with the ATF without a warrant who was investigating Defendant for a separate case pertaining to various firearm offenses), and *Loera*, 923 F.3d at 924 (finding a subsequent search of digital evidence to be

unreasonable where law enforcement obtained a warrant to search for evidence of electronic fraud but instead directed its search at evidence of child pornography), *with United States v. Hewlett*, 471 F. Supp. 3d 724, 735-36 (E.D. Va. 2020) (rejecting Defendant's argument that because federal investigators did not obtain their own warrant to search his cell phones for evidence of child pornography, the evidence of child pornography discovered on defendant's cell phones must be suppressed where the state search warrant for defendant's phone authorized a search for evidence of contributing to the delinquency of the minor and use of communications systems to facilitate certain offenses involving children, and the child pornography evidence that the LCSO discovered was clearly evidence of contributing to delinquency of a minor, and was clearly evidence of the use of communications systems to facilitate certain offenses involving children), and *United States v. Johnston*, 789 F.3d 934, 942-43 (9th Cir. 2015) (rejecting Defendant's argument that the third review of his data extraction was rummaging for more offenses where testimony supported that the method of search was directed at evidence of crimes alleged in the warrant and discovery of evidence of additional crimes was merely a reflection of the practical reality that Defendant's criminal activities were intermingled). To the contrary, here, without the evidence of Defendant specifically providing drugs to Ms. Lenoir, there is no other evidence of any felony to support the state charge of felony murder. That is, evidence of drugs is, by definition, within the scope of the APD's warrants for tangible evidence of murder. *See*

*Williams v. State*, 779 S.E.2d 304, 309 (Ga. 2015) (jury was authorized to find that defendants who kept supply of crack cocaine "inside a hole in the living room sofa" that their young child could access created a foreseeable risk of death and thus was authorized to find defendants guilty of felony murder based on possession of cocaine with intent to distribute after the child ingested the cocaine and died); *Eubanks v. State*, 894 S.E.2d 27, 40 (Ga. 2023) (finding evidence that Defendant possessed heroin with intent to distribute to support conviction for felony murder where victim fatally ingested Defendant's heroin); *State v. Ovalle*, No. S26A0544, 2026 WL 1868666, at *4 (Ga. June 30, 2026) (holding that a conviction for felony murder under O.C.G.A 16-5-1(c) requires evidence that is constitutionally sufficient to show that the defendant's conduct related to the distribution of narcotics proximately caused Nicholson's death).

Accordingly, the Court finds that the 2024 review was a continuation of the 2022 search. That means that the APD did not exceed the bounds of the Phone Search Warrant in 2024 when Det. Leonpacher searched the 2022 extraction for an identifier attributed to Defendant's online narcotics trafficking business.

### 3. <u>APD's Sharing of the Data with the FBI</u>

Last, Defendant argues that the APD exceeded the bounds of their warrants when they shared Defendant's records with the FBI without a new warrant permitting them to do so and that this impermissible sharing tainted the state evidence so as to prohibit use in the federal case. [Doc. 161, pp. 16–19]; [Doc. 162, pp. 13–15]; [Doc. 163,

pp. 14–16]; [Doc. 164, pp. 7–10]; [Doc. 165, pp. 7–10]; [Doc. 169, pp. 10–14]. The Court does not waste time here because even if the APD's sharing of the evidence violated the Fourth Amendment, the exclusionary rule does not apply retroactively to suppress evidence that has been lawfully searched and seized. *United States v. Lee*, 274 U.S. 559, 563 (1927).

Having found that the APD reasonably executed each of its valid warrants,[32] the Court concludes that none of the evidence obtained from the APD's search and seizure of Defendant's AT&T, iCloud, Google, iPhone SE or iPhone 13 ProMax ran afoul of the Constitution. The Court therefore declines to suppress any evidence based on an unlawful search and seizure by the APD and **DENIES** the following six motions:

(1) Motion to Suppress Evidence Obtained as a Result of the August 5, 2022 AT&T Warrant (Number 22-SW-185) [Doc. 161];

(2) Motion to Suppress Evidence Obtained as a Result of the August 11, 2022 iCloud Warrant (Fulton County Warrant Number [Doc. 162];

(3) Motion to Suppress Evidence Obtained as a Result of The August 17, 2022 Fulton County Warrant For Google Records [Doc. 163];

(4) Motion to Suppress Evidence Obtained as a Result of Dekalb Warrant Number 22-SW-744 [Doc. 164];

(5) Motion to Suppress Evidence Obtained as A Result of Fulton County Warrant

[32] *See* pp. 61–71 *supra*.

SW-038055 [Doc. 165]; and

(6) Motion to Suppress Evidence Obtained From Two Cell Phones as a Result of the August 24, 2022 Fulton Warrant (22-SW-030865) [Doc. 169].

### C. FBI'S SEARCH OF DEFENDANT'S RECORDS OBTAINED BY APD

In his remaining three motions, Defendant challenges the federal warrants the FBI obtained in 2024 (the "Federal Warrants"). Defendant argues that the Federal Warrants relied on evidence that was the fruit of an unlawful search because the FBI impermissibly obtained and reviewed Defendant's records from the APD without a warrant and for completely different crimes from those alleged in the APD warrants, thereby expanding the scope of the APD's warrants. [Doc. 169, pp. 10–15]; [Doc. 170, pp. 3–9]; [Doc. 176, pp. 3–7]. The Government responds that sharing the records with the FBI was legal because the APD obtained the records pursuant to valid warrants and Agent McCusker limited his search to the bounds of the respective warrants. [Doc. 196, p. 3]; [Doc. 193, pp. 2–3]; [Doc. 194, pp. 2–3]. In the alternative, the Government argues that the good-faith exception applies so that the Court should not suppress the evidence. [Doc. 196, pp. 3–4]; [Doc. 193, pp. 3–4]; [Doc. 194. pp. 3–4].

The Court begins by noting that, based on its research, this case appears to present an issue of first impression in the Eleventh Circuit. Defendant's challenges boil down to one question: when does the sharing of one law enforcement agency's lawfully obtained records with another agency violate the Fourth Amendment?

Let's start at the beginning. A search is constitutional if it doesn't violate a person's "reasonable" or "legitimate" expectation of privacy. *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring). Whether an expectation of privacy is reasonable, thereby triggering Fourth Amendment protection, involves a two-prong test: (1) a person must have exhibited an actual subjective expectation of privacy in the place searched or thing seized and (2) this expectation must be one that society is willing to recognize as reasonable. *United States v. Smith*, 459 F.3d 1276, 1290 n. 14 (11th Cir. 2006). No bright-line rule exists when deciding if an expectation of privacy is constitutionally reasonable. *See O'Connor v. Ortega*, 480 U.S. 709, 715 (1987). Whether a person's expectation of privacy in an area searched is legitimate is determined by an objective standard drawn from common experience and based on the totality of the circumstances. *See United States v. Rivera-Pabon*, 493 F. App'x 15, at *17 (11th Cir. 2012) (citing *United States v. Sarda–Villa*, 760 F.2d 1232, 1235 (11th Cir.1985)).

Moreover, people have heightened expectations of privacy in the information stored on their cellphones and other electronic devices, so law enforcement generally must obtain a warrant before conducting a search of cell phone data. *Riley*, 573 U.S. at 386. Why? Because cell phones and personal computers share the notable distinguishing features of immense storage capacity and the ability to collect many distinct types of information, including "a cache of sensitive personal information" concerning nearly every aspect of a person's life. *Id*. at 393-95. Therefore, unlike

warrants to search physical evidence such as clothes or a briefcase, a warrant to search a cell phone does not extinguish a person's expectation of privacy in the entirety of the contents stored on the phone. *See id.*

Nevertheless, certain circumstances may diminish an individual's reasonable expectation of privacy — even in his cell phone. *See e.g.*, *Carpenter v. United States*, 585 U.S. 296, 314 (2018); *Samson v. California*, 547 U.S. 843, 844 (2006). Applying these principles to the question of what expectation of privacy remains in a phone extraction obtained pursuant to a valid warrant, courts have first acknowledged that "an extraction is a copy of the [phone's] memory module from beginning to end." *United States v. Hernandez*, 167 F.4th 1113, 1123 (11th Cir. 2026), *cert. denied*, No. 25-7421, 2026 WL 1780117 (U.S. June 22, 2026) (citing *Olson v. Cnty. of Grant*, 127 F.4th 1193, 1195 (9th Cir. 2025)). Recall that "[w]hen criminal investigators reexamine evidence that has lawfully been seized pursuant to a warrant – returning to look again at a drug ledger, for instance, or to perform lab tests on a blood-stained jacket – we do not ordinarily view such investigative steps as constituting a new Fourth Amendment event." *United States v. Johnson*, 93 F.4th 605, 613 (2d Cir.), *cert. denied*, 145 S. Ct. 276, 220 L. Ed. 2d 85 (2024). Moreover, it is well-established law that "the seizure of electronic devices … is very different from the seizure of a drug ledger or an item of clothing." *Id*. (quoting *United States v. Ganias*, 824 F.3d 199, 217 (2d Cir. 2016)). Accordingly, "the mere fact that digital material has been lawfully collected does not in all circumstances permit the

future review of stored information." *Id.* Still, it is also clear that the "general principle that law enforcement can reexamine lawfully seized material during the course of an investigation without engaging in a new search has clear application" in a case where the Court is asked to consider how the privacy interest in one's electronic device is diminished by one law enforcement agency's lawful search of contents responsive to a warrant. *Id*.

Defendant cites to numerous cases where Courts have found a second agency's review of a defendant's phone extraction, obtained through a different agency's valid warrant, to have been impermissible. For example, *Hulsher*, cited by Defendant, indeed rejected the Government's position that, in essence, law enforcement agencies can permanently save all *unresponsive* data collected from a cell phone after a search for future prosecutions on unrelated charges. 2017 WL 657436 at *3. The *Hulsher* Court came to this conclusion based on several important facts. In *Hulsher*, the Huron Police Department, which was investigating the defendant for forgery, counterfeiting, and identity theft, obtained the defendant's phone data pursuant to a warrant and then segregated the responsive data from the non-responsive data. *Id*. at *1. After the ATF, who was investigating the defendant for various firearm charges, discovered that the Huron Police Department had data taken from Hulscher's iPhone, ATF agents reached out and obtained the segregated data that related only to the state charges. *Id*. Soon after, the ATF reached out again and obtained the non-responsive data which it

intended to use in its own trial. *Id*. Since the data had been segregated and the ATF specifically requested the non-responsive data, the Court found that the ATF's search was not directed at evidence related to the warrants issued in the state case. *Id*. at *3 This is in addition to the fact that the two investigations involved wholly independent crimes. *Id*. at *3 ("[T]he warrant was limited to a search for evidence relating to the counterfeiting charges, and a reasonable officer who read the search warrant would have known that. Thus . . . the government's position is that Agent Fair knew about the . . . search warrant and disregarded its parameters.")

*Carey*, is similarly instructive. *See* 172 F.3d at 1276. In *Carey*, the Tenth Circuit found that law enforcement exceeded the scope of a warrant when they temporarily abandoned the original search for evidence of computer fraud and, for five hours, pursued evidence of child pornography. *See id.* The Tenth Circuit found that instead of navigating away from the nonresponsive material, the officer "downloaded approximately two hundred forty-four more JPG files and then transferred them to nineteen disks, viewing five to seven images on each disk to determine that they all contained child pornography." *See Loera*, 923 F.3d at 916–17 (explaining its ruling in *Carey* and reiterating that "[g]iven the enormous amount of data that computers can store [,] . . . the traditional rule risks allowing unlimited electronic searches. [Therefore] . . . rather than focusing our analysis of the reasonableness of an electronic search on "what" a . . . warrant permitted the government agents to search . . . we have focused

on "how" the agents carried out the search . . . .")

Lastly, the Ninth Circuit found a phone search unlawful in a case where "agencies from two different state jurisdictions shared a defendant's sensitive phone data without consent, without a warrant, and without any pending charges, or even an investigation by the out-of-state agency requesting access to the data." *Olson*, 127 F.4th at 1195. There, Olson consented only to the Idaho State Police's search of her phone following her arrest for marijuana possession, but Oregon officials later obtained the complete extraction and searched merely because they were "curious" whether the extraction might reveal misconduct by Olson's boyfriend, an Oregon officer, when they heard through the grapevine that his business card was found in Olson's vehicle. *Id.* at 1200. The Oregon officer later justified the search of the defendant's phone only on the possibility that the data could contain *Brady* material in some hypothetical future case. *Id.* Thus, the later search was conducted by a different agency in another state, concerned a different person, and was untethered to any actual criminal investigation, much less to the purpose for which Olson originally consented to the phone search. *Id.* at 1195.

While the caselaw Defendant points the Court to is instructive, other case law reveals that the matter is not so clear cut. Consider *United States v. Johnson,* which sits at the very opposite end of the spectrum. 93 F.4th 605. There, the Second Circuit upheld a search of the defendant's phone extraction by a different agency almost a year after he

entered a guilty plea in the original case in which the FBI seized a copy of his phone extraction. *Id*. at 608. In *Johnson*, the FBI, pursuant to a warrant for possession and distribution of child pornography, searched and seized thousands of artifacts from various electronic devices belonging to the defendant and then segregated the responsive from the non-responsive data. *Id*. at 609. Almost a year after he entered a guilty plea to one count of possession of child pornography, the National Center for Missing and Exploited Children ("NCMEC"), who had been forwarded a copy of the responsive data, identified an additional video within the responsive materials that the FBI had missed. *Id*. at 610–11. The video depicted Johnson sexually molesting his young daughter. *Id*. After NCMEC advised the FBI of its finding, the FBI opened a new investigation, executed a new search warrant for Johnson's home, and indicted Johnson with production of child pornography, a separate crime from the one that he had plead to one year prior. *Id*. at 611–12. The Second Circuit affirmed the district court's finding that, even assuming NCMEC acted as a government agent, the Fourth Amendment was not violated because NCMEC reviewed only known contraband in which Johnson "had no Fourth Amendment interest that could be infringed by the search . . . or by any subsequent review of the same digital material . . . ." *Id*. at 613. Importantly, *Johnson* turned almost entirely on the fact that because the data had been segregated, the subsequent review of the data, even by another agency, necessarily could not have infringed the Fourth Amendment because "[t]here is no privacy interest in contraband

following its lawful detection." *United States v. Johnson*, No. 5:19-CR-140, 2021 WL 2667168, at *6 (D. Vt. June 29, 2021), *aff'd*, 93 F.4th 605 (2d Cir. 2024) (citing *Illinois v. Andreas*, 463 U.S. 765, 771 (1983)).

The Eleventh Circuit has similarly approached its own line of cases where intra-agency sharing of incriminating evidence is at issue. In *United States v. Williamson*, the defendant's email was searched by his provider, a private party, when its system flagged the presence of child pornography. 2026 WL 1876371, at *2. The email provider then forwarded a report to NCMEC who, after its own review, forwarded it to law enforcement. *Id.* at *3. Based on the third-party doctrine having frustrated the defendant's privacy interests in contraband materials, the Court found that law enforcement's credible testimony that the searching officers did not exceed the scope of the private party's review sufficient to satisfy the government's burden "to present sufficient evidence from which the district court could conclude that the searches at issue did not violate Williamson's rights." *Id.* at *7–8.

Although *Williamson* was decided on the third-party doctrine, the doctrine finds its roots in the principle that "[o]nce frustration of the original expectation of privacy occurs, the Fourth Amendment does not prohibit governmental use of the now-nonprivate information." *Odoni*, 782 F.3d at 1239 (citing *United States v. Jacobsen*, 466 U.S. 109, 117 (1984)). Indeed, this very principle runs throughout the near entirety of Fourth Amendment jurisprudence. It underlies the private-search doctrine. *United States*

*v. Young*, 350 F.3d 1302, 1306–07 (11th Cir. 2003) ("No reasonable person would expect to retain his or her privacy interest in a packaged shipment after signing an airbill containing an explicit, written warning that the carrier is authorized to act in direct contravention to that interest.") It explains why consent permits the government to use information voluntarily exposed to it. *United States v. Beckett*, 369 F. App'x 52, 57 (11th Cir. 2010) ("A person has no legitimate expectation of privacy in information he voluntarily turns over to third parties." (quoting *Smith v. Maryland,* 442 U.S. 735 (1979)). It animates the plain-view and abandonment doctrines. *United States v. Falsey*, 566 F. App'x 864, 867 (11th Cir. 2014) ("[T]he issue is not abandonment in the strict property-right sense, but whether the person prejudiced by the search had voluntarily . . . relinquished his interest in the property . . . so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search.") (quoting *United States v. Williams,* 569 F.2d 823, 826 (5th Cir.1978)); *United States v. Hollis*, 780 F.3d 1064 (11th Cir. 2015) ("[I]f contraband is left in open view and is observed by a police officer from a lawful vantage point, there has been no invasion of a legitimate expectation of privacy…or at least no search independent of the initial intrusion . . . .") (quoting *Minnesota v. Dickerson,* 508 U.S. 366, 375 (1993)). So, it's not surprising that this same principle—reflecting the Supreme Court's longstanding effort to safeguard legitimate privacy interests without imposing the exclusionary rule's substantial societal costs where no protected privacy remains—has taken root in the digital world's

Fourth Amendment jurisprudence and become decisive in this line of cases. *See Jacobsen*, 466 U.S. at 117; *Herring v. United States*, 555 U.S. 135, 141 (2009); *see also Johnson*, 2021 WL 2667168, at *6 ("There is no privacy interest in contraband following its lawful detection") (citing *Illinois v. Andreas*, 463 U.S. 765, 771 (1983)); *United States v. Bah*, 794 F.3d 617, 632 (6th Cir. 2015) ("The question presented here lies at an intersection . . . between the principle that there is no legitimate privacy interest in already-known information, and . . . no legitimate privacy interest in contraband.") (citation omitted)).

Each of these cases recognize, in one form or another, that the Fourth Amendment does not require officers to ignore information where a reasonable expectation of privacy has already been relinquished or frustrated. This principle is as pervasive in decisions finding that second searches of data obtained pursuant to valid warrants were lawful as it is in those cases which have gone the other way. *Compare United States v. Carey*, 172 F.3d 1268, 1273–76 (10th Cir. 1999) (holding that an officer exceeded the scope of a drug warrant by spending five hours deliberately examining hundreds of distinct, nonresponsive child-pornography files after the first image revealed their nature), *with United States v. Walser*, 275 F.3d 981, 986–87 (10th Cir. 2001) (holding that an officer remained within the scope of a drug warrant where he used a targeted search method, inadvertently encountered child pornography in a location where responsive records could logically be found, and immediately ceased searching), *and United States v. Burgess*, 576 F.3d 1078, 1092–94 (10th Cir. 2009) (holding that

previewing numerous image files remained reasonably directed toward drug-trafficking evidence where the warrant authorized a search for photographs and no practical, narrower method existed); *see also Loera*, 923 F.3d at 917–20 (distilling cases to distinguish a purposeful and prolonged detour into clearly nonresponsive material from a reasonably tailored search that inadvertently uncovers evidence of another crime).

Although the factual setting here presents a relatively novel Fourth Amendment question in the Eleventh Circuit, the governing inquiry covers well-plowed ground: did the FBI's review of Defendant's records obtained by the APD pursuant to valid warrants infringe on his reasonable expectation of privacy? In making that determination, the Court considers the duration and breadth of the FBI's review, whether responsive and nonresponsive data had been segregated, whether the challenged information was encountered in a location where warrant-authorized evidence could reasonably be found, and whether the FBI embarked on a discernible detour into material unrelated to the crimes identified in the warrants. *See also Loera*, 923 F.3d at 917–20. This approach accords with Eleventh Circuit authority and with the decisions of other circuits confronting the same basic issue. *See Miranda*, 325 F. App'x at 859–60 (affirming denial of suppression where an officer continued a warrant-authorized search for counterfeit-software evidence after discovering child pornography); *United States v. Stabile*, 633 F.3d 219, 240 (3d Cir. 2011) (upholding

continued search for evidence of financial crimes after discovery of child pornography); *United States v. Williams*, 592 F.3d 511, 521–24 (4th Cir. 2010) (upholding continued search for evidence of threats and computer harassment after discovery of child pornography); *United States v. Wong*, 334 F.3d 831, 834–38 (9th Cir. 2003) (upholding continued warrant-authorized search after discovery of child pornography); *see also Loera*, 923 F.3d at 920.

This approach may appear broad at first glance, particularly in light of the Court's ultimate decision. Nevertheless, it sits comfortably within the text of the Fourth Amendment and its central command of reasonableness provides adequate guardrails. The decisions discussed above show that courts taking this approach have had no trouble in readily identifying searches that impermissibly stray from their lawful object.

The Court acknowledges that most murder and missing-persons investigations will not be so entangled with a defendant's alleged activity in trafficking narcotics so a warrant for the former will permit a search for evidence of the latter. Gray cases like this one highlight the wisdom of the approach that other courts have taken in deciding these tricky issues. Here, the Court's reasoning in denying the Defendant's relevant motions to suppress protects against indiscriminate interagency rummaging through retained digital data. And, the Court's decision reflects the unusual degree to which these investigations overlapped, the totality of these unique facts, the application of long-settled Fourth Amendment principles, and an "extension of that reasoning to digital

data" which "rest[s] on its own bottom." *Riley*, 573 U.S. at 393.

Modern technology permits unprecedented governmental access to the private details of a person's life. However, this same technology that magnifies privacy concerns also lowers barriers for criminal activity because it allows crimes to be conducted more efficiently and concealed more effectively, proliferating social harms with the click of a button. Courts must remain attentive to both realities—protecting against digital general warrants without artificially restricting lawful searches merely because their evidence exists in digital form—lest Fourth Amendment doctrine "embarrass the future." *Carpenter*, 585 U.S. at 316 (citation omitted).

To recap, the question the Court must answer is whether the FBI's review revealed information in which Defendant retained a reasonable expectation of privacy because that information fell outside the scope of the APD warrants. The Court finds that it did not.

**1. <u>FBI's Review of Defendant's iPhone SE Data</u>**

Easy stuff first. Defendant challenges the 2024 Federal Warrants and subpoenas as fruits of Agent McCusker's unlawful search of Defendant's iPhone SE extraction that he obtained from the APD. Defendant points to numerous exhibits and items contained in the Federal Warrants to show the Court that Agent McCusker expanded the scope of the APD's warrants since each warrant was based on a "murder" case, but Agent McCusker's search was directed at a narcotics trafficking investigation. [Doc. 170, p. 4];

[Doc. 176, p. 4].

First, Defendant directs the Court to Agent McCusker's 2024 federal warrant affidavits requesting Defendant's Apple iCloud and Google records, where Agent McCusker specifically referenced his analyses of Defendant's iPhone SE and included an image of the "wallstreetbets" identifier found on Defendant's phone by Det. Leonpacher. [Doc. 18-1, p. 19]; [Doc. 22-1, p. 19]. According to Defendant, the image is clearly outside the scope of state court warrant, "which was aimed at a murder investigation that occurred on July 30-31, 2022[.]" [Doc. 170, p. 4]; [Doc. 176, p. 4].

The Court rejects Defendant's framing of the two investigations. A warrant's scope is defined by the crimes it identifies and evidence bearing a nexus to those enumerated crimes—even if not separately itemized in the warrant—is lawfully searchable. *Andresen v. Maryland*, 427 U.S. 463, 474 (1976); *see also Signature Pharmacy, Inc. v. Wright*, 438 F. App'x 741, 746 (11th Cir. 2011); *Santarelli*, 778 F.2d at 614–15. That scope may be "as extensive as reasonably required" to locate evidence of the listed crimes, particularly where the crime under investigation is factually complex. *United States v. Moon*, 33 F.4th 1284, 1296 (11th Cir. 2022) (quoting *Wuagneux*, 683 F.2d at 1352).

In this case, the predicate felony for the felony murder charge was drug distribution. So, evidence of narcotics trafficking isn't evidence of some separate, unrelated offense; rather, it represents the critical instrumentality of the murder itself, without which there is no predicate felony and no felony murder. *See United States v.*

*Joseph*, 978 F.3d 1251 (11th Cir. 2020). During the evidentiary hearing, the Government put up troves of evidence to support its position that the image that the FBI asked the APD to look for was fundamental to the state case. Agent McCusker's testimony established the identifier as essentially a logo for an online narcotics trafficker on the dark web attributed to Defendant. [Doc. 237, pp. 112]. Further, Det. Demeester and Det. Leonpacher both testified that this image was directly relevant to the APD's investigation. [*Id*. at p. 22, p. 90]. The Court's independent review of the evidence submitted also reflects that the image was from August 3, 2022, placing it directly within the warrant's time-based scope. [Doc. 236-2, pp. 1–2]. Accordingly, based on the testimony of the investigators (which the Court finds credible) and the Court's own review of the evidence, the identifier portrayed in the Federal Warrants and challenged here by Defendant is in fact directly relevant to the APD investigation and responsive to the warrant. Therefore, Agent McCusker's subsequent review of this image did not violate the Fourth Amendment because Defendant's privacy interest in the image had already been frustrated and/or terminated by the APD's warrant. *See Johnson*, 93 F.4th at 613.

A corollary to this conclusion is that since the image directly responded to the APD's warrants, the Court cannot infer from it that Agent McCusker expanded beyond the parameters of the APD's lawful search so that he created a new Fourth Amendment event. *Williamson*, 2026 WL 1876371 at *8 (affirming the lower court's finding based on

similar facts that the government met "its burden to present sufficient evidence from which the district court could conclude that the searches at issue did not violate [the defendant's] rights" where the searching officer testified that his search was within the parameters of the warrant and the testimony was both credible and uncontroverted by the defendant).

Defendant also submitted exhibits purporting to "show that agents were conducting a full review of the files before they even obtained copies of the relevant subpoenas." [Doc. 261, p. 10]. The first was an FBI report from July 2024 that was generated after an FBI analyst copied the extraction of the iPhone SE provided by the APD into Cellebrite.[33] Defendant then directs the court to an email sent by Agent McCusker to Det. Demeester "two weeks later" in response to Det. Demeester's email providing the warrants where Agent McCusker says "Just realized the warrants have a specified date range. Any chance you got a warrant for these phones with not [sic] date range? We have some good evidence outside of the scope but we can't use it." [Doc. 236-14, p. 1]. According to Defendant, the report was made on "July 5, 2024" so that there was a two-week period where Agent McCusker would have been reviewing the phone records without ever even having seen the warrants, much less adhering to any

[33] Since the APD used XRY and, at the time, did not have Cellebrite, the FBI had to do this to decode the data and make it readable. [Doc 263, pp. 4–5]. However, the extraction, and therefore content within the extracted data, remained the exact same. Cellebrite and XRY are merely two different decoding software programs. [*Id.*].

scope. [Doc 261, p. 10].

However, the exhibits do not necessarily support Defendant's conclusion. The referenced report indeed includes the "July 5, 2024" as the "Request Date," however, the same report also provides a "Report Date" of "July 17, 2024," presumably the date the report was created.[34] [Doc. 261-1, p. 1]. According to Defendant, (1) Agent McCusker requested the readable extraction report on July 5th; (2) Agent McCusker requested the warrants from Det. Demeester on July 17th, 2024; therefore, (3) during the two-week interim period, Agent McCusker was reviewing the data in a fully readable format without having even touched the warrants. [Doc. 261, p. 10]. But this conclusion does not necessarily follow.

The report does not specify when it was completed, nor does it say when Agent McCusker actually received the readable report. It only shows that the request was made and that an Analyst began the Cellebrite generation on July 5, 2024. [Doc. 261-1, p. 1]. Even assuming that this was shown, there is no evidence to support that Agent McCusker actually looked at the readable extraction during the two weeks before he obtained the warrants from the APD. Because the only email that indicates Agent McCusker was looking at the data occurred hours after he requested the warrants, it is just as likely that he began to review the data in the period between his receipt of the

[34] Moreover, the Report refers to specific details regarding the APD warrant including that it was "signed by the Honorable Debbie-Ann Rickaman in the Magistrate Court of Fulton County on August 24, 2022" which suggests the Report was written after a review of the warrant.

warrants and this email. [Doc. 236-14, p. 1]. In fact, Agent McCusker even testified that this investigation was something he was "working on the side" since he had other more active cases he was investigating. [Doc. 237, p. 113]. Therefore, a more accurate conclusion based on the evidence would be (1) Agent McCusker requested the Cellebrite extraction on July 5, 2024; (2) Agent McCusker requested the warrants on July 17, 2024 at 11:33 a.m. [Doc. 236-8, pp. 1]; (3) Det. Demeester then sent the warrants some hours later on the same day [Doc. 236-14, p. 1]; (4) six hours later on the same day, Agent McCusker responded to Det. Demeester saying, "[w]e have some good evidence outside of the scope but can't use it" [Doc. 236-14, p. 1]; therefore, (5) sometime between July 5th and July 17th, Agent McCusker reviewed the extraction. Defendant does not provide any reason for the Court to believe Agent McCusker was reviewing the report, assuming he could since it is unclear when the data was actually made readable, before he had the warrants in his possession.

Defendant would have the Court assume that Agent McCusker's email must mean he had been illegally and improperly "rummaging" through the records for 12 days, but this asks too much. Even though "officers should limit exposure to innocent files, for a computer search, in the end, there may be no practical substitute for actually looking in many (perhaps all) folders and sometimes at the documents contained within those folders." *See United States v. Mesika*, No. 1:16-CR-224-MHC-CMS, 2018 WL 2124899, at *10 (N.D. Ga. Mar. 30, 2018) (citing *United States v. Triplett*, 684 F.3d 500, 505–

06 (5th Cir. 2012)).

With this in mind, Agent McCusker testified that he "started flagging some things, realized it was out of scope, generated a report," and informed the AUSA about the things that [he] viewed that were outside the scope," at which point he verified "with APD there was no other warrants that were written for an extended scope on…both of the devices." [Doc. 237, p. 114]. Considering the entirety of the record, Defendant has not otherwise shown that Agent McCusker continued any farther so as to indicate the sort of temporary abandonment of the original search to conduct a search unrelated to the crimes alleged in the warrant, which the Fourth Amendment undoubtedly condemns. *Khanani*, 502 F.3d at 1289.

Defendant next argues that "Analyst Smith's Cellebrite reports contain data well outside the scope of the state court warrants and even Agent McCusker admitted that his smaller report also contains images from outside the timeline outlined in the state court warrants." [Doc. 261, p. 10]. However, seizure of items not covered by a warrant does not automatically invalidate an otherwise valid search. *United States v. Lisbon*, 835 F. Supp. 2d 1329, 1346 (N.D. Ga. 2011), *aff'd sub nom*. *United States v. Moreno*, 559 F. App'x 940 (11th Cir. 2014) (citing S*chandl,* 947 F.2d at 465). "Only the evidence seized while the police are acting outside of the boundaries of the warrant is subject to suppression." *United States v. Hendrixson*, 234 F.3d 494, 497 (11th Cir. 2000).

Despite his allegations, Defendant does not specifically point to which items he

contends the FBI seized in violation of the warrant. He only generally complains about the seizure of "data well outside the scope of the state court warrants." Defendant generally references "Analyst Smith's Cellebrite reports" as being beyond the scope, but he neither submitted this report nor specified what specific evidence fell beyond the scope.[35] [Doc. 261, p. 10]. His statement that "Agent McCusker admitted that his smaller report also contains images from outside the timeline outlined in the state court warrants," aside from being a misconstruction of what Agent McCusker said, fails for the same reason. [*Id*.]. Without specifically detailing how the FBI exceeded the warrant's scope with evidence in the record, not just assumptions and guesswork, Defendant's challenges do not entitle him to suppression. *See Mesika*, 2018 WL 2124899, at *10 (holding that digital evidence that includes materials outside the scope of the warrant is not detrimental to the warrant's reasonable execution "[s]o long as the…search is limited to a search for evidence explicitly authorized in the warrant.") (quoting *United States v. Richards*, 659 F.3d 527, 540 (6th Cir. 2011)); *Khanani*, 502 F.3d at 1290-91 (finding that manual culling through evidence to identify what is responsive to a warrant's scope satisfies the Fourth Amendment reasonableness requirement, and "[a]bsent a 'flagrant disregard' of the terms of the warrant, the seizure of items outside the scope of a warrant will not affect admissibility of items properly seized.")

[35] Again, the Defendant retains the responsibility to point this evidence out to the Court. *See United States v. Jackson*, 723 F. Supp. 3d 1347, 1350 (M.D. Ga. 2024). The Court is under no obligation to sift through the record to find it. *See Chavez v. Sec'y Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011).

Defendant's last challenge to Agent McCusker's review of his iPhone SE data directs the Court to a GrayKey report of the iPhone SE that was created on February 27, 2025. [Doc. 261, pp. 10-11]. Defendant argues that "it appears…the FBI did a separate review of the data using GrayKey on February 27, 2025, which returned web searches and web pages related to Wallstreetbets, bitcoin postage, and coinbase." [*Id.*]; *see also* [Doc. 161-2, pp. 1-12]. As an initial matter, the Court has already ruled that evidence of Defendant's possession and distribution of narcotics was within the scope of the APD's warrants for evidence of a felony murder based on a drug overdose. Therefore, the websearch for "wallstreetbets" was clearly responsive to the APD's warrant, so its seizure by the FBI did not infringe on Defendant's reasonable expectation of privacy. As to the bitcoin postage and coinbase, Agent McCusker testified that this was one of the ways that "wallstreetbets" conducted its trafficking transactions. [Doc. 237, p. 168].

Again, the state's warrant sought evidence of Defendant's involvement in Ms. Lenoir's drug-overdose death (felony murder), so it naturally follows that evidence of Defendant's sale or purchase of drugs that might have involved Ms. Lenoir would necessarily be encompassed by the warrant. What's more is that the report is substantially composed of searches regarding Ms. Lenoir, further lending credence to

the fact that method of the search related directly to the scope of the warrant.[36] [Doc. 261-2]; [Doc. 261-3]. Both reports also appear to indicate that each search was within the temporal scope of the APD warrant, July 20, 2022 through August 24, 2022. [Doc. 236-19, p. 1]; [Doc. 261-1, p. 2]. Lastly, two reports identify the source of the data as "Safari," which is a third-party app/internet search browser, also covered by the APD warrant. [Doc. 236-19, p. 1 ("Content and data expected to be extracted will be the phone information, phone book, call logs, text messages, pictures videos, *third party application* and data.") (emphasis added)]. The saved searches provide significant evidence that Defendant's alleged involvement with Ms. Lenoir's drug overdose was deeply intermingled, in both timeline and substance, with his alleged narcotics trafficking. Ironically, Defendant's exhibits show that the FBI comported with the scope of the APD warrant rather than exceeding it. *See Johnston*, 789 F.3d at 942-43 (distinguishing *Carey*, 172 F.3d 1268 as presenting "an entirely different situation" where "the government agent was searching a computer for evidence of drug sales when he stumbled across child pornography images.")

Based on Agent McCusker's testimony and the evidence submitted, the Court finds that the FBI's search of Defendant's iPhone SE data did not exceed the parameters

[36] A few of the searches which explicitly involve Ms. Lenoir include the following website titles:

(1) "Family Pleads For Answers In Case Of Missing Georgia Woman Last Seen In Atlanta" [Doc. 261-1, p. 6 (searched August 17, 2022)]; and
(2) "allahnia lenoire – Google Search" [Doc. 261-1, p. 7 (sic) (searched August, 19, 2022)].

of the APD's lawfully seized evidence and therefore did not infringe on Defendant's reasonable expectation of privacy. Each exhibit Defendant points to shows the evidence to be responsive to the APD's warrants and Defendant has not otherwise shown that Agent McCusker directed his search at finding evidence relating to criminal activity other than that which was alleged in the warrant – drug possession. *Cf. Carey*, 172 F.3d at 1275 n.8 ("Where a search warrant seeks only financial records, law enforcement officers should not be allowed to search through telephone lists or word processing files absent a showing of some reason to believe that these files contain the financial records sought.").

Although the APD did not segregate responsive data from nonresponsive data, both the APD and FBI investigations were very much active during the time Agent McCusker reviewed the extraction and the evidence that has been shown to have reviewed by Agent McCusker falls so squarely within the scope of the APD warrant that had it been segregated, it would have easily been deemed to be responsive. *Khanani*, 502 F.3d at 1290-91 (rejecting the argument that the lack of a search protocol required the district court to suppress all evidence agents seized because of the search of the defendants' computers).

Having considered each of Defendant's arguments that Agent McCusker unlawfully searched the iPhone SE extraction by going outside the bounds of the APD's warrant, the Court finds that the evidence shows the contrary. The Court finds Agent

McCusker's review of the extraction data reasonable under the totality of the circumstances and facts of this case and that his search did not exceed the parameters of evidence for which Defendant's privacy interest had already been frustrated by the APD's warrants. The Court finds no intentional or flagrant disregard of the Federal Warrants' scope so that exclusion is not proper and, to the extent the three Federal Warrants relied on his review of the iPhone SE data, they were not tainted by an unlawful search.

**2. <u>FBI's Review of Defendant's iPhone 13 ProMax</u>**

This section will be short and to the point. First, Defendant argues that Agent McCusker "eventually admitted that he also generated his own, smaller Cellebrite reports when he was searching the files generated by Analysis Smith" [Doc. 261, p. 9]. Defendant argues that "[t]he extraction and manipulation of the data files that were otherwise indecipherable to the FBI was a search." [*Id*.]. The government responds that the smaller extractions, including the two in question, were decoding of the exact same information already provided by the APD, resulting in different formats of reviewing subsets of data already present in the same extractions provided by the APD. [Doc. 262, p. 4]. Again, Defendant bears the burden of making the initial showing to support that the search was unlawful. *See United States v. Cooper*, 133 F.3d 1394, 1398 (11th Cir.1998).

The Court begins with the mysterious Cellebrite report Defendant brought up during the evidentiary hearing, which was apparently created by Agent McCusker on

October 7, 2024 and included at least one image outside the scope of the warrant. [Doc. 237, pp. 115-17]. Interestingly enough, Defendant did not submit this report or the photo in question as an exhibit for the Court to review. Instead, Defendant's attorney used her computer to navigate to her personal discovery folder for the case where she had Agent McCusker recite the name of each folder until she ultimately reached this report within a folder named "10/7/2024." [*Id*.]. When Agent McCusker, who was visibly confused, attempted to reiterate that he had no recollection of doing this, Defendant's attorney never allowed any explanation. [*Id*.]. The Court finds it somewhat curious that Defendant, unafraid to submit exhibits into the record, chose not to submit this report as an exhibit for the Court's review. Without jumping to any rash conclusions, the Court simply notes that the exhibit in question is not in evidence. Without ever being allowed to see the report, the Court is not inclined to make any sweeping conclusion regarding either the validity of this particular image or whether this shows with such certainty that Agent McCusker broadly violated the bounds of the warrant based on Defendant's personal discovery folder displayed on a projector in court.

Moreover, Defendant repeatedly accuses Agent McCusker of going through "the entire phone extraction," which, at first blush, certainly sounds like the very kind of limitless search the Fourth Amendment prohibits — until it is considered against the established context of what the "entire phone extraction" contains. Det. Leonpacher

testified that the extraction of the iPhone 13 ProMax contained limited data because it was found in a "before first unlock [state], which creates a real [sic] limited set of data that can be reviewed. . . ." [*Id*. at p. 39]. In other words, the "entire phone extraction," as it pertains to the iPhone 13 ProMax, was not nearly as robust as Defendant would have the Court believe. Instead, the FBI's review was constrained to the limited dataset that the APD was able to extract from the phone in 2022. Indeed, Agent McCusker similarly testified that the iPhone 13 ProMax had no usable data [*Id*. at p. 104] and the government has disavowed its use of the iPhone 13 ProMax as evidence for trial because "there's nothing obtained from it." [*Id*. at p. 108]. Accordingly, Agent McCusker testified that his review of the data from the iPhone 13 ProMax "was not used" in his application for the Federal Warrants. [*Id*. at p. 152]. The Court's independent review of the Federal Warrants shows the same. Viewed in this light, Agent McCusker's otherwise conflicting testimony that he went through the "entire phone" while also repeatedly stating, "[t]he only thing that I recall on there was photos" and that he "started with photos and ended with photos" makes much more sense. [*Id*. at p. 153–54].

In sum, the Court finds that Defendant has not established that an unlawful search occurred as to either the iPhone SE or iPhone 13 ProMax, both of which were searched pursuant to the APD's warrant from Fulton County. [Doc. 236-19]. Accordingly, the Court rejects Defendant's argument that the subpoenas and Federal

Warrants obtained by the FBI in 2024 were tainted by an unlawful search of both phones.

### 3. FBI's Review of Defendant's Google Records

Defendant next challenges the FBI's review of Defendant's Google records provided by the APD. [Doc. 168, pp. 10-9]; [Doc. 170, pp. 4-6]; [Doc. 176, pp. 4-6]. According to Defendant, Agent McCusker's review of the Google records broadened the scope of the APD's warrants and therefore tainted his subsequent warrants and subpoenas where he states that the FBI examined Defendant's Google records and found items of evidentiary value. [Doc. 168, pp. 10-9]; [Doc. 170, pp. 4-6]; [Doc. 176, pp. 4-6]. The Court again disagrees.

The APD's warrant for the Defendant's Google records allowed it to search for tangible evidence of the crimes of murder (O.C.G.A. §16-5-1), concealing the death of another (§16-10-31), kidnapping (§16-5-40), false imprisonment (§16-5-41), and possession of a controlled substance (§16-13-30). [Doc. 236-24, p. 8]. The warrant limited any search to records between May 30, 2022, through August 17, 2022.[37] [*Id*. at p. 7]. When asked during the evidentiary hearing whether he was just searching through Defendant's "entire" Google records, Agent McCusker testified "[w]ithin the scope,

---

[37] Defendant vaguely states that "the search of the evidence returned from the Fulton County warrants exceeded the scope of the initial warrants," however it is not clear what "warrants" Defendant is referencing here and he has not submitted any additional evidence or argument that would lead the Court to believe Google provided information outside the temporal scope of the warrant.

yes." [Doc. 237, p. 123]. Defendant's counsel then replied "[w]ell, we already know that you were outside the scope because you admitted it in an e-mail and also in the Cellebrite reports we just looked at." [*Id*.]. However, the email Defendant is referring to here is one from Agent McCusker to Det. Demeester with a subject line "Oboite cell phone search warrants" where, in response to receiving the warrants, Agent McCusker stated, "[w]e have some good evidence outside of the scope but we can't use it." [Doc. 236-14]. Clearly the email was irrelevant to the scope of Agent McCusker's search of Defendant's Google records.

While it is true that Agent McCusker testified that the FBI looked over most of the Google records before getting its warrant, this nonetheless fails to show that Agent McCusker unreasonably directed his search towards finding evidence outside the scope of the warrant so as to be a flagrant disregard for the warrant's terms. Defendant again asked no questions about Agent McCusker's search methodology. Nor has Defendant pointed to any evidence found by Agent McCusker that was materially outside the scope of the warrant, much less that Agent McCusker reviewed any material not responsive to the warrant beyond the permitted cursory review so as to render the search unreasonable. *Moon*, 33 F.4th 1284, 1297 (11th Cir. 2022) ("When a warrant authorizes the seizure of documents, an officer acting pursuant to such a warrant is entitled to examine any document he discovers, in order to perceive the relevance of the documents to the crime.") (citation omitted). "[T]he perusal must cease at the point of

which the warrant's inapplicability to *each document* is clear." *Id.* (emphasis added) (citation omitted). Rather, Defendant posits that because Agent McCusker "admitted" to going through the entire iPhone 13 ProMax, which the Court has already addressed, then "[i]t makes no sense that he would have decided not to search the Apple records as well." [Doc 261, pp. 11–12]; [Doc. 237, pp. 180–190]. The Court directly addressed this assumption at the evidentiary hearing:

> THE COURT: You're right. But you keep saying he looked through everything, and I'm saying, "Okay. Show me. When did he look through all of the Apple records? When did he look through all the Google search records? When did he look through all of these things?" You're assuming he did -- he went through every potential record.
>
> MS. DURRETT: Your Honor, I am assuming that.

[Doc. 237, p. 189]. But, assumptions don't count.

Moreover, based on Agent McCusker's testimony and the evidence on the record showing that his search of the Google records went no further than allowed, the Court finds that his search of Defendant's Google records was reasonably directed at evidence of the criminal activity alleged in the APD warrant and declines to find the search to have been unlawful. To the extent that this evidence was used to obtain subpoenas and warrants, those same subpoenas and warrants were not tainted by any unlawful search.

**4. <u>FBI's Review of Defendant's iCloud Records</u>**

Last, Defendant argues that the FBI's review of his iCloud records was unlawful because it exceeded the bounds of the APD's warrant. Defendant has provided no

evidence to substantiate this allegation other than the two reports he attached to his post-hearing brief which he never submitted nor even mentioned during the hearing. [Doc. 261-2]; [Doc. 261-3]. According to Defendant, the reports must controvert Agent McCusker's testimony that he did not review the iCloud data because the warrants had no temporal scope. [Doc. 261, p. 11]. True, Agent McCusker testified that he did not go through the iCloud records "[b]ecause there was no date range." [Doc. 237, p. 103]. Having found Agent McCusker to be a credible witness, the Court will not conclude that he lied based on two exhibits submitted by Defendant in his post-hearing brief that lack any context nor do they even name Agent McCusker or otherwise identify him as the person who generated it.[38] [Doc. 261-4]; [Doc. 261-5]. Accordingly, the Court finds that Agent McCusker didn't unlawfully search the Apple iCloud data. Hence, any subpoena or Federal Warrant that relied on evidence was not tainted by an unlawful search.

### D. PROBABLE CAUSE

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The Amendment further requires that "no Warrants shall issue, but upon probable cause,

---

[38] The Court notes here that throughout the entirety of this process, it has found several of Defendant's arguments and factual assertions to have been at best, negligently or sloppily offered and at worst, downright misleading. Had the Court not taken the time to go back and closely reexamine each individual exhibit to ensure it supported the proposition as Defendant attested, it would very well have credited claims it shouldn't have, or worse, improperly discredited law enforcement witnesses' testimony. Neither is acceptable.

supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." An application for a search warrant must be supported by probable cause, and "[i]t is critical to a showing of probable cause that the affidavit state facts sufficient to justify a conclusion that evidence or contraband will probably be found at the premises to be searched." *Martin*, 297 F.3d at 1314 (citation omitted). Put another way, the application "must contain sufficient information to conclude that a fair probability existed that seizable [sic] evidence would be found in the place to be searched." *Id.* (citation omitted).

As to particularity, "[a] warrant which fails to sufficiently particularize the place to be searched or the things to be seized is unconstitutionally overbroad." *Travers*, 233 F.3d at 1329. The warrant need not be elaborately specific, however. "The standard is one of practical accuracy rather than technical nicety." *United States v. Rousseau*, 628 F. App'x 1022, 1025 (11th Cir. 2015) (quoting *United States v. Betancourt*, 734 F.2d 750, 754 (11th Cir. 1984)). A search executed based on a warrant "may be as extensive as reasonably required to locate the items described in the warrant." *United States v. Hunt*, No. 22-12947, 2023 WL 6319363, at *2 (11th Cir. Sept. 28, 2023) (quoting *Moon*, 33 F.4th at 1296). Regarding the place to be searched, the warrant must describe the place to be searched "sufficient particularity to direct the searcher, to confine his examination to the place described, and to advise those being searched of his authority." *Rousseau*, 628 F. App'x at 1025 (per curiam) (quoting *United States v. Burke*, 784 F.2d 1090, 1092 (11th Cir.

1986)). The particularity requirement is satisfied regarding the items to be seized when the warrant "enables the searcher reasonably to ascertain and identify the things to be seized." *Id.* (quoting *Santarelli*, 778 F.2d at 614).

### 1. **Probable Cause**

Defendant argues that the Federal Warrants for his Apple records, Google records, and search of his DNR phone seized upon his arrest at Lake Altoona on the Fulton County murder warrant lacked probable cause because each "provides limited information about [Defendant]" that is "particularly true when the improper evidence from the Fulton County warrant is excised from the document." [Doc. 168, p. 11]; [Doc. 170, p. 8]; [Doc. 176, p. 8]. Since, Defendant argues "[t]he probable cause section of the warrant about [Defendant] is based largely on the records that were illegally obtained from the 2022 Fulton County and DeKalb County search warrants[,] without this information, the warrant could not stand against [Defendant]." [Doc. 168, pp. 11–12]; [Doc. 170, p. 8–9]; [Doc. 176, pp. 8–9].

As to the Federal Warrants for Defendant's Google and Apple records, the Government responds that "[a] review of the four corners of the federal search warrant at issue shows that there was probable cause to authorize the search[]" and that "it was reasonable to believe that [Defendant's]…records would include evidence of the offenses of investigation listed in the warrant." [Doc. 193, p. 2]; [Doc 194, p. 2]. Referring to the Federal Warrant for the search of Defendant's DNR phone, the government states

that the Federal Warrant for the search of Defendant's DNR phone "was supported by probable cause, was not overbroad, and provided a nexus between the phone and the illegal activity being investigated." [Doc. 192, p. 3]. In the alternative, the Government argues that the good-faith exception applies. [Doc. 193, p. 3–4]; [Doc. 194, p. 3–4]. The Court agrees.

**Federal Warrants for Defendant's Google & Apple Records**

In his affidavits for the Google and Apple warrants, which were applied for contemporaneously, Agent McCusker explained that Defendant was identified as a suspect based on financial records between him and Eric Bechet, who the FBI had previously identified as a key suspect based on its controlled buys and surveillance footage from postal offices. [Doc. 18-1, pp. 13–17]; [Doc. 22-1, pp. 13–17]. Agent McCusker also explained that Defendant's connection to wallstreetbets was reinforced when it suddenly went inactive immediately after Defendant's arrest and, upon its return online, its spokesperson (whom the FBI's confidential informant had remained in constant communication) pinned the absence on their lead having an unexpected accident. [Doc. 18-1, p. 18]; [Doc. 22-1, p. 18]. Agent McCusker further testified in his affidavit that from that point forward, while Defendant was in state custody after his arrest by DNR, the wallstreetbets representative communicating with the FBI to execute the controlled buys appeared to be a different individual than before. [Doc. 18-1, p. 18]; [Doc. 22-1, p. 18]. Agent McCusker included facts surrounding overdoses of four

individuals, including Ms. Lenoir, to explain how the FBI traced each overdose back to the online narcotics trafficker wallstreetbets and, in the case of Ms. Lenoir, directly back to Defendant, who had at this point already been identified as a suspect. [Doc. 18-1, pp. 10–12, 19]; [Doc. 22-1, pp. 10–12, 19]. Agent McCusker also explained that the FBI was able to trace an email obtained by the CHS to transactions attributed to Defendant based on his Gmail account address and phone number, finding, in addition, more recent transactions between Bechet and Defendant for large sums of money. Lastly, Agent McCusker explained that a review of the records provided by the APD based on their investigation of one of the four overdoses that had been traced to wallstreetbets, the FBI had identified the same image of the identifier used by wallstreet bets and other items of evidentiary value in in Defendant's phone also present in his Google records. [Doc. 18-1, pp. 18–22]; [Doc. 22-1, pp. 18–22].

Finally, the Court considered Agent McCusker's thorough affidavit that painstakingly described all of the events during the previous five years of investigation to support his request for these two warrants. Suffice it to say, the Court has no reservation in concluding that there was ample evidence to more than support a finding of probable cause and Judge Weigle reasonably believed that Defendant's Apple and Google records would include evidence of the offenses of investigation listed in the warrant.

**Federal Warrants for Search of Defendant's DNR Phone**

As to Defendant's probable cause challenge of the warrant to search his DNR phone, Agent McCusker's affidavit, though shorter and more concise, states virtually identical facts to those outlined above as to Defendant and Bechet. Moreover, since this warrant was sought after the Google and Apple records were obtained from his prior warrant, Agent McCusker added that the Apple records revealed a "photo ledger and narcotics in [Defendant's] Apple mail that are consistent with listings from the dark web, which say 'Wallstreetbets' and the date." [Doc. 179, DNR Phone Federal Warrant, p. 16]. Critically, Agent McCusker also explained that the DNR phone he sought to search had been stored at the Fulton County Jail and therefore remained in the same state it was in when Defendant was arrested, supporting his assertion probable cause existed to fairly believe that evidence of the crimes he was investigating would be found on the device. [*Id.*]. Again, it was clearly reasonable for Judge Weigle to find that a search of Defendant's DNR phone would likely reveal evidence of the crimes for which he was being investigated. The warrant therefore satisfied the Fourth Amendment's probable-cause requirement.[39]

Considering the totality of these circumstances, the Court finds that there was a

[39] The only argument Defendant made which did not depend on the Court excising the APD records information argues that Agent McCusker claims that Defendant "was identified through his Wells Fargo records on May 28, 2024, but the warrant does not explain how these records were obtained." [Doc. 168, p. 11]; [Doc. 170, p. 8]; [Doc. 176, p. 8]. This does nothing to undermine the sufficient probable cause in the warrant. Nevertheless, the affidavits do state that the financial records were requested through Wells Fargo.

fair probability that evidence of the crime would be found in Defendant's Apple and Google records. *United States v. Lopez*, 649 F.3d 1222, 1245 (11th Cir. 2011) (citation omitted). As to Defendant's DNR phone, the Supreme Court has recognized that "[c]ell phones have become important tools in facilitating coordination and communication among members of criminal enterprises, and can provide valuable incriminating information about dangerous criminals." *Riley*, 573 U.S. at 401. "Indeed, it takes no special expertise for a judge to infer that information related to an active criminal enterprise may be contained on a cell phone. *United States v. Kendricks*, No. 1:15-CR-400-MHC-AJB, 2016 WL 5952743, at *7 (N.D. Ga. Oct. 13, 2016), *aff'd*, 723 F. App'x 950 (11th Cir. 2018) (citing Riley, 573 U.S. at 401). Thus, the evidence identified in the affidavit "created a substantial basis for the magistrate to find probable cause to search [Defendant's] phone." *United States v. Manning*, No. 1:19-CR-00376-TWT-RGV, 2021 WL 5236660, at *15 (N.D. Ga. Aug. 20, 2021), *report and recommendation adopted sub nom. United States v. Davis*, No. 1:19-CR-376-4-TWT, 2021 WL 5232480 (N.D. Ga. Nov. 10, 2021), and *report and recommendation adopted sub nom*. *United States v. Daniel*, No. 1:19-CR-376-2-TWT, 2021 WL 5232484 (N.D. Ga. Nov. 10, 2021), and *report and recommendation adopted sub nom. United States v. Sterling*, No. 1:19-CR-376-3-TWT, 2021 WL 5280567 (N.D. Ga. Nov. 12, 2021); *United States v. Miller*, No. 1:21-CR-142-TWT-CMS, 2025 WL 4676547, at *5 (N.D. Ga. Dec. 15, 2025), *report and recommendation adopted*, No. CV 1:21-CR-142-TWT, 2026 WL 958188 (N.D. Ga. Apr. 8, 2026) ("This

information is sufficient to establish probable cause to believe that evidence of drug trafficking activity would be on Miller's phone.") Therefore, Defendant's motion to suppress must be denied on this basis as well.

**2. <u>Particularity</u>**

As to all three Federal Warrants, Defendant makes the same conclusory argument that "[t]he warrant in this case did not satisfy the Fourth Amendment's particularity requirement because it failed to limit the items to be seized to items related to the crime being investigated." [Doc. 168, pp. 12–13]; [Doc. 170, pp. 9–10]; [Doc. 176, pp. 9–10] Specifically, Defendant argues that "[t]he warrant was virtually unlimited in scope and time and was not tailored to the crimes at issue," and asks the Court to suppress any evidence obtained. [Doc. 168, pp. 12–13]; [Doc. 170, pp. 9–10]; [Doc. 176, pp. 9–10].

Defendant's argument plainly fails. As previously mentioned, to satisfy the Fourth Amendment's particularity requirement, a warrant must "particularly" describe "the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The Eleventh Circuit has expressed preference for time-based limitations to the scope of a warrant allowing a search of digital records. *McCall*, 84 F.4th at 1328. To that end, all three Federal Warrants limit the warrants to documents created between March 2021 and the date of the warrant. [Doc. 18-1, p. 46]; [Doc. 22-1, p. 48]; [Doc. 179, DNR Phone Federal Warrant, Attachment B]. That is, the scope of the Federal Warrants

directly aligns with the time that the FBI had been investigating wallstreetbets. To take things one step farther, each warrant is also limited by some form of a subject-based scope. *McCall*, 84 F.4th at 1328 (explaining that there are generally two types of limitations that can particularize warrants for digital evidence: narrowing the search based on the subject matter of the data or based on a temporal limitation). All three Federal Warrants identify the subject offense based on sufficient probable cause. Each warrant also identified the email and phone number of the account requested, and, pertaining to the phone search warrant, included a precise description of the phone and its location.

Lastly, the warrants linked the information to be seized to the subject offense by offering ample reason to believe that each of the categories of information sought would be evidence or instrumentalities of the crimes enumerated. *Id.* Both the Google and Apple warrants provide ten pages' worth of detailed explanation of the evidentiary value of each file or record requested as it relates to the crime alleged in the warrant. [Doc. 18-1, pp. 31–41]; [Doc. 22-1, pp. 31–41]. The DNR Phone Search warrant affidavit, also incorporated into the warrant, goes one step further and limits each item to be searched and seized to that which is tied to the crime alleged in the warrant through language that states some variation of "relating to the possession or sale of narcotics." [Doc. 179, DNR Phone Federal Warrant, Attachment B]. For example, the warrant states, "All bank records, checks, credit card bills, account information and other financial

records that refer or relate to drug use or distribution." [Doc. 179, DNR Phone Federal Warrant, Attachment B]. Accordingly, the warrants were sufficiently particularized and valid.

### E. DEFENDANT'S REQUEST FOR A *FRANKS* HEARING

Finally, in each of the three motions challenging the Federal Warrants, Defendant argues that the warrant's affidavits were misleading or intentionally omitted facts sufficient to warrant a *Franks* hearing. [Doc. 168, pp. 13–14]; [Doc. 170, pp. 10–11]; [Doc. 176, pp. 10–11]. Here, Defendant verbatim recycles his argument from his probable cause arguments and recycles them as omissions. Specifically, Defendant argues that the warrant affidavit fails to explain where the FBI got the Wells Fargo financial records linking Defendant to the crime. [Doc. 168, pp. 13–14]; [Doc. 170, pp. 10–11]; [Doc. 176, pp. 10–11]. Defendant again relies on the Court excising the statements from the affidavit to argue that because the evidence regarding Defendant is so thin, the omission is material to the finding of probable cause. Because this argument rests on the same factual predicate already addressed above, and because Defendant's argument is otherwise identical across all three motions, the Court denies Defendant's request for a *Franks* hearing and finds the statement to be immaterial on the same grounds already discussed as to Defendant's probable-cause challenge. Again, the Court cut nothing from the warrant's affidavit. Moreover, the Court has already established that the affidavit contains more than enough evidence tying Defendant to the crime alleged in

the warrant. [Doc. 168, p. 14]; [Doc. 170, p. 11]; [Doc. 176, p. 11].

## CONCLUSION

For the reasons discussed above, the Court **DENIES** all ten (10) of Defendant's Motions to Suppress [Doc. 161]; [Doc. 162]; [Doc. 163]; [Doc. 164]; [Doc. 165]; [Doc. 167]; [Doc. 168]; [Doc. 169]; [Doc. 170]; [Doc. 176].

**SO ORDERED**, this 28th day of August, 2026.

s/Tilman E. Self, III
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**